RUSSO DEVELOPMENT
CORPORATION,
Plaintiff,

v.

Lee M. THOMAS, Administrator of the United States Environmental Protection Agency, Christopher J. Daggett, Regional Administrator for Region II of the United States Environmental Protection Agency, John O. Marsh, Jr., Secretary of the Army, Lt. Gen. Elvin R. Heilberg, III, Chief of Engineers, Col. Marion L. Caldwell, Jr., District Engineer of the United States Army Corps of Engineers, New York District, Defendants.

Civ. No. 87–3916.

United States District Court,
D. New Jersey.

Nov. 6, 1989.

William J. Prout, Jr., Michael S. Miller, Tompkins, McGuire, & Wachenfeld, Newark, N.J.

David J. Bardin, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C.

James C. Woods, Asst. U.S. Atty., Newark, N.J.

## OPINION

SAROKIN, District Judge.

In this action for declarative and injunctive relief from an Environmental Protection Agency ("EPA") veto of an after-the-fact permit granted to plaintiff by the U.S. Army Corps of Engineers ("Corps"), pursuant to Section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. Sec. 1344(c), defendants move for dismissal or, in the alternative, summary judgment. Plaintiff cross-moves for partial summary judgment.

## BACKGROUND

The following facts are undisputed:

Plaintiff Russo Development Corp. ("Russo") is a New Jersey real estate developer which constructs office and/or warehouse facilities on otherwise undeveloped property. Plaintiff has constructed over forty such facilities since the commencement of its operations in 1968, and all of these facilities have been constructed in municipalities falling under the jurisdiction of the Hackensack Meadowlands Development Commission ("HMDC").

The HMDC was established by statute to exercise comprehensive land-use planning and regulatory authority throughout the Hackensack Meadowlands District ("District"), an area adjoining the Hackensack River and consisting of approximately 20,000 acres of water, coastal (tidal and nontidal) wetlands, and associated uplands. Plaintiff's 12G Statement at 3, @@ 7, 8. In accordance with its statutory mandate, the HMDC has published inventories of wetlands in the District, mapped the wetlands resources of the District in its Bio–Zone reports, and has published the results of its inventories and maps as the HMDC Master Plan since 1972. *Id.* at 4, @ 9.

Pursuant to the Coastal Management Act of 1972 ("CZMA") and the New Jersey Coastal Management Program ("NJCMP"), the HMDC and HMDC Master Plan have been federally approved as the state agency and state plan responsible for implemen-

tation of the CZMA in the District. Although the Department of Interior challenged the HMDC Master Plan as to the amount of filling of wetlands it permitted, no federal agency challenged the HMDC's wetland delineation and inventory. *Id.* at 5–6, @ 12.

In 1979, Russo purchased a 44–acre parcel of land located in Carlstadt, New Jersey from Empire, Ltd. ("Empire"). These 44 acres had been classified by the HMDC as "dry fields" in its Wetlands Bio–Zone reports and wetland inventories. Admin. Record of Army Corps of Engineers ("ARC") at 231. Russo's contract with Empire was contingent upon Empire's securing several permits from the HMDC. Affidavit of Lawrence Russo, Jr. at @@ 5, 19. The HMDC Master Plan had designated the 44 acres for development in the "Light Industrial and Distribution" zone in Carlstadt, and in 1978 Empire applied to the HMDC for the authority necessary to develop the parcel. *Id.* In May of 1979, the HMDC approved the requested major subdivisions and road construction permits. *Id.* at @ 9. In 1979, Empire began the filling and paving to construct the two access roads which eventually bordered the 44 acres, Commerce Boulevard and Central Boulevard, and these roads were completed and conveyed to the Borough in 1982. *Id.* at @@ 9, 10.

Russo began to excavate and deposit clean fill on the 44–acre parcel in 1979, and essentially completed the process by 1982. These fill activities were conducted openly and in plain view of the New Jersey Turnpike and Washington Avenue in Carlstadt. *Id.* at @ 70. Russo completed seven warehouses on the parcel, selling one of them and renting out the others. *Id.* at @ 10.

In March, 1981, the United States Fish and Wildlife Service ("F & WS") complained in writing to the Corps that "Russo Construction Company" was illegally filling ten acres of wetlands for road and building construction. ARC at 359, 690. The Corps responded by letter in April of 1981, informing the F & WS that the filling "was found to be in violation" of federal law, that the owners of the property had been

directed to cease work, and that the case would be processed according to Corps regulations. ARC at 362, 692. However, in reality no action was taken by the Corps in response to the F & WS complaint other than the above-mentioned letter to the F & WS: no notice was given to Russo or any other interested party, and neither the Corps nor the F & WS took any further action.

In January of 1985, Russo contracted to purchase a 13.5–acre tract from Empire which is located due east of the 44–acre parcel on the other side of Central Boulevard. Prior to its purchase of the property, Russo obtained the consent of Empire to begin excavating and filling the 13.5 acres in preparation for construction of a warehouse and office facility similar to that constructed on the 44–acre parcel. Russo Affidavit at @ 63.

The Corps received an anonymous telephone complaint in March, 1985, which alleged illegal fill activity in the area of Commerce Road in Carlstadt. ARC at 693. Acting on the information it received, the Corps identified the 13.5–acre tract as the property undergoing filling activity and Russo as the owner of the tract, and the Corps related the 13.5 acres to the F & WS complaint received four years before. ARC at 694–697. On March 25, 1985, the Corps advised Russo that it had determined the 13.5 acres to be protected wetlands under the Clean Water Act ("CWA") and orally requested that Russo cease and desist from further filling on the property. ARC at 699. Russo immediately suspended the work on the 13.5 acres, with five acres left to be filled, and began preparing a permit application for the 13.5 acres. Plaintiff's Rule 12G Statement at @ 70. A formal cease and desist order was issued by the Corps on April 24, 1985. ARC at 753.

While Russo suspended its operations on the 13.5–acre parcel, it continued its construction work on the seventh warehouse on the 44–acre parcel across the street. Plaintiff's Rule 12G Statement at @ 72a, b. In June of 1985, the Corps notified plaintiff orally that it considered some or all of the

44 acres to have been protected wetlands subject to the Corps' jurisdiction under the CWA. Russo Affidavit at @ 30. This representation was made to Russo when he attended a meeting at the Corps' New York offices regarding his application for a permit to fill the 13.5 acres. *Id.* The Corps advised the plaintiff that it would issue a cease and desist order to stop construction on the 44–acre parcel and would refuse to process the permit application relating to the 13.5–acre parcel unless plaintiff also sought an after-the-fact permit as to the completed construction on the 44–acre parcel. *Id.* at @ 31; ARC at 828.

In response to the Corps' direction, plaintiff submitted an application for a permit to fill the remaining five acres of the 13.5–acre parcel and for an after-the-fact permit authorizing the previously-completed filling operations on the other 8.5 acres of the 13.5–acre parcel and on the 44–acre parcel. Russo Affidavit at @ 35. Plaintiff's application included alternative site evaluations and mitigation proposals. *Id.* The Corps received plaintiff's application on June 17, 1985, but because of insufficient information the application was not deemed complete by the Corps until August 27, 1985. Defendants' 12G Statement at @ 2. Public notice of the application was issued on August 28, 1985, and on March 23, 1987, after extensive administrative consideration, the Corps issued its Notice of Intent to Issue a Sec. 404(b) permit to plaintiff. Defendants' 12G Statement at @@ 3–23; Plaintiff's 12G Statement at @ 79.

On May 26, 1987, the EPA, after having unsuccessfully requested that the Corps reconsider its permit decision at a higher level, initiated proceedings under Section 404(c) of the CWA, 33 U.S.C. Sec. 1344(c). Defendants' 12G Statement at @@ 24–26. On March 21, 1988, the EPA vetoed the Corps permit. Defendants' 12G Statement at @@ 45–48. The EPA's veto relied in large part on a report provided to it by the Maguire Group, which evaluated the 44–acre and 13.5–acre parcels and determined

them to have been "high-quality" wetlands prior to Russo's filling activities. This determination by the Maguire Group and by the EPA differs from an earlier determination by the Corps that the parcels were "marginal" wetlands. *See,* ARC at 607. The EPA's evaluation of the parcels as "high-quality" wetlands led it to conclude that the mitigation ratio accepted by the Corps was too low and thus to veto the Corps' decision to grant the permit to plaintiff.

## DISCUSSION

In order to prevail on a motion for summary judgment,[1] a party must show that there are no genuine issues of material fact and that, viewing the facts in the light most favorable to the opposing party, the opposing party cannot prevail as a matter of law. Fed.R.Civ.P. 56. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81, 83 (3d Cir.1987); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Summary judgment has been characterized by the Third Circuit as a "drastic remedy", and the court must resolve any doubts as to the existence of factual issues against the moving party. *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir. 1981). The parties in the present action agree that many issues raised in the motions before the court are issues of law which do not depend upon the resolution of any factual issues and which are thus appropriately decided in a summary fashion. *See,* Plaintiff's Supplemental Written Response; Defendants' Letter in Response to Plaintiff's Supplemental Written Response.

### I. Defendants' Motion for Summary Judgment

### A. Jurisdiction

 Defendants argue that they have jurisdiction over the Russo properties in

---

1. Defendants characterized their motion as a motion to dismiss or, in the alternative, for summary judgment. Because defendants have relied on submissions outside of the pleadings,

the court deems their motion as most appropriately being one for summary judgment. *See,* Fed.R.Civ.P. 56.

question. As the agencies charged with administering the Clean Water Act, the determinations of the Corps and the EPA that the Russo properties are wetlands subject to federal jurisdiction should be granted great deference by this court. *See, e.g., Motor Vehicle Manufacturers' Association v. State Farm Insurance Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Plaintiff, on the other hand, asserts that there are material issues of fact regarding the appropriateness of the government's determination that the properties were wetlands and whether the National Headwaters Permit applied to the Russo properties. In addition, plaintiff has asserted a variety of defenses to the jurisdiction of the Corps and the EPA, which will be discussed below.

The court concludes that the issue of whether or not the Russo properties were wetlands subject to the jurisdiction of the Corps and the EPA is a disputed issue of material fact. Plaintiff has submitted several affidavits of people who had the opportunity to observe the quality of the land in question before Russo's filling operations began, and these affidavits contradict the factual findings of the EPA and the Corps regarding the qualities of the properties which were considered in making their jurisdictional determinations. *See,* Certification of Dominick B. Tucci, Sr.; Second Certification of Dominick B. Tucci, Sr.; Certification of Charles R. Biggs; Certification of William K. Fehring; Second Certification of William K. Fehring; Certification of Lawrence Russo, Jr.; Certification of George D. Cascino. In support of their position that the parcels in question were wetlands and thus that jurisdiction is appropriate, the defendants rely on the administrative record and on affidavits submitted in support of their motion. *See, e.g.,* Certification of David R. Westcott; Third Affidavit of Mario P. Del Vicario.

■ The court's review of the administrative determination of jurisdiction by the Corps and the EPA is governed by the arbitrary and capricious standard set forth in the Administrative Procedure Act, 5 U.S.C. Sec. 706. The court's inquiry in the present action, therefore, must be whether the government's interpretation of Section 404(c) of the CWA and its regulations was reasonable and whether the application of its interpretation to the facts was rational. *See, Bersani v. U.S. Environmental Protection Agency,* 674 F.Supp. 405 (N.D.N.Y. 1987), aff'd 850 F.2d 36 (2d Cir.1988). Although great deference is to be given to the jurisdictional determination by the Corps and the EPA, the court concludes that the plaintiff's submissions regarding the quality of the lands in question, when combined with plaintiff's allegations of bad faith by the administrative agencies making the jurisdictional determinations, create a sufficient issue of fact regarding whether the assertion of jurisdiction was appropriate that the court will deny defendants' motion for summary judgment on this issue.

### B. The EPA Veto

Defendants argue that the EPA's veto of the Corps' permit was reasonable and supported by the administrative record, and they move for summary judgment on this issue. Because the issue of the reasonableness of the veto is intimately tied to the determination that the lands in question were wetlands and related to the quality of the parcels prior to Russo's filling activities, the court concludes that granting summary judgment on this issue would be inappropriate. The plaintiff's submissions regarding the quality of the parcels before filling and construction and regarding the alleged bad faith of the regulatory agencies create a sufficient issue of fact to survive defendants' motion. However, the court will discuss the EPA veto in more detail below, when it addresses plaintiff's arguments regarding bad faith and the applicability of Section 404(c) to after-the-fact permits.

### C. Due Process

■ Defendants contend that the administrative procedures, which included public hearings and opportunities for plaintiff to present its arguments, were adequate to meet the requirements of the due process

clause. Plaintiff responds that the "process" it received was not received within a meaningful time or in a meaningful manner.

Plaintiff contends that if it were provided with a hearing in 1981, when the Corps first determined that it had jurisdiction and that Russo's filling activities violated the Clean Water Act, it would have been able to prove that the properties were not wetlands subject to federal jurisdiction and it would not have suffered the losses that they now may suffer as a result of the government's four-year delay in taking any action on the properties. Defendants simply contend that it is within their discretion to take action whenever they deem it appropriate.

Although the court does not rule out the possibility that a delay by a government agency may be so excessive as to constitute a deprivation of a party's due process rights, the court concludes that the delay in the present case did not deprive the plaintiff of constitutional due process. Plaintiff was provided with an opportunity to be heard and the administrative proceedings leading to the Corps permit and the EPA veto were sufficient to provide plaintiff with its due process rights, even though those rights were provided belatedly. It is true that many of the choices which the plaintiff could have made if it had been advised of the alleged violations at the time the defendants had knowledge of them are no longer available to plaintiff. However, that the delay in enforcement may have resulted in some inequities is not sufficient to establish a constitutional due process claim. The court will deny plaintiff's cross-motion insofar as it relies on a due process claim.

### D. Takings Claim

■ Defendants argue that plaintiff's taking claim is not properly before this court; rather, they contend that pursuant to the Tucker Act, 28 U.S.C. Sec. 1491, only the Court of Claims has jurisdiction to hear takings claims for monetary relief. Plaintiff counters this argument by stating that its complaint specifically requests only declaratory and injunctive relief and does not request monetary compensation. Thus, plaintiff contends that under Third Circuit precedent, the district court may hear takings claims for significant prospective, non-monetary relief and that plaintiff's takings claim falls within this court's jurisdiction. *See, Hahn v. United States,* 757 F.2d 581, 590 (3d Cir.1985) (citing *Minnesota by Noot v. Heckler,* 718 F.2d 852, 858 (8th Cir.1983).

The court concludes that plaintiff has sufficiently stated a claim for significant, prospective, non-monetary relief for this court to have jurisdiction over plaintiff's requests for declarative and injunctive relief with respect to its takings claims. If the court were to ultimately determine that plaintiff's takings claims had merit, the most likely consequences of such a determination would be simply a lowering of the penalties and mitigation requirements for a permit rather than the payment of money damages. Assuming that the federal government has jurisdiction over the property in question, defendants would be permitted to place limitations on the use of the property and to require payment of penalties and mitigation in the absence of compliance. The "taking" question would be whether the limitations or penalties or mitigation requirements were excessive enough to constitute a *de facto* taking without compensation. Since the government would be entitled to regulate the property without compensating the plaintiff up to a certain point, the most likely outcome of a grant of declaratory or injunctive relief to plaintiff on the taking issue would be a decision requiring the government to lower its demands for payment of penalties and mitigation requirements in exchange for the permit, rather than the payment to plaintiff of money damages. Thus, the court will deny defendants' request for summary judgment dismissing plaintiff's takings claim for lack of jurisdiction.

### II. Plaintiff's Cross–Motion for Summary Judgment

### A. Inclusion of 44–Acre Parcel in Application

■ Russo contends that the Corps acted outside its authority in refusing to pro-

cess the application for a permit for the 13.5–acre parcel unless the 44–acre parcel was added to the application. Defendants contend that the Corps is authorized to require a single application for both parcels. In dispute is the interpretation of 33 C.F.R. Sec. 325.1(d)(2), which requires applicants to include in their applications "all activities ... reasonably related to the same project...." Russo argues that the two parcels were clearly not the "same project", since they were purchased almost six years apart and since the 44–acre plot had already been fully developed at the time of the application. Defendants contend that it is within the discretion of the Corps to determine what constitutes the "same project" and that the court should defer to its determination that the two parcels should be considered in one application.

The court concludes that the Corps improperly required plaintiff to include both tracts of land in its application. The two parcels of land are contiguous to each other, but they were developed separately. It is only the unique circumstance that the parcels are contiguous which could have justified the Corps' insistence on including the two parcels in one application. However, the facts clearly demonstrate that the development of the two parcels was not the "same project". The 44–acre parcel was purchased separately from the 13.5–acre parcel and was almost completely developed at the time of the purchase of the 13.5–acre plot.

The court thus concludes that the requirement by the Corps that plaintiff include both tracts in its application was arbitrary, unreasonable and not in accordance with applicable regulations. The court will order the Corps to take separate appropriate action, if any, with respect to the 44–acre tract, and will limit the plaintiff's application for a Corps permit and the subsequent grant and veto of the permit to the 13.5–acre parcel.

### B. Estoppel

■ The parties agree that four elements of equitable estoppel must be met in order for the government to be estopped from asserting its jurisdiction over Russo's property: there must be a misrepresentation, made willfully or negligently by the government, upon which plaintiff reasonably relied to its detriment, as well as affirmative misconduct on the part of the government. *Lovell Manufacturing v. Export–Import Bank of the United States,* 777 F.2d 894, 898 (3d Cir.1985). Plaintiff contends that all of the above elements have been met, whereas defendants contend that none of them have been met.

The court need not reach the question of whether equitable estoppel applies to the government's conduct in relationship to the 44 acres. Since the affirmative misconduct by the government only involved that particular parcel, the court concludes that estoppel is not applicable to the second parcel. Russo did not purchase the 13.5–acre parcel until 1985 and had only partially completed the filling of that parcel when the Corps asserted jurisdiction over the parcel. Although plaintiff argues that it would never have contracted to purchase the 13.5 acres had the Corps acted properly with respect to the 44–acre parcel in 1981, the court is not willing to extend the principle of equitable estoppel in this case so far as to include a separate piece of property which was not involved in the misrepresentations made in 1981. The court cannot conclude with certainty that the 13.5–acre parcel would not have been purchased had the administrative proceedings with respect to the 44 acres been commenced in 1981. Having purchased the 13.5 acres, Russo should not be relieved of its duty to mitigate if federal wetlands jurisdiction is deemed to be appropriate.

### C. EPA Determination of "High Value" Wetlands

Plaintiff contends that the "sudden flip-flop" of the EPA in changing its characterization of the property from "low value" or "marginal" wetlands to "high value" wetlands was arbitrary and capricious and an abuse of discretion. Defendants counter that there was a sufficient basis in the record for the determination that the prop-

erties were "high value" wetlands, based on studies of the unfilled portions of the properties, adjacent properties, maps, interviews, and aerial photographs of vegetation taken prior to the development of the land.

The court concludes that whether the EPA's change in characterization of the properties was justified depends on the underlying factual determination of whether the properties were wetlands and, if so, then what "type" of wetlands they were prior to their development. The court cannot resolve the underlying factual dispute on this motion for summary judgment, and plaintiff's motion will be denied.

### D. EPA's Failure to Consider the New Jersey Coastal Management Program

■ Plaintiff argues that under Section 307 of the Coastal Zone Management Act, 16 U.S.C. 1456, the EPA was obligated to consider the New Jersey Coastal Management Program in making its determination that the properties were wetlands and that a permit should not be permitted, and that the matter should be at least remanded to the EPA with instructions to consider the program. Defendants contend that there was no such obligation, and that even if there were such an obligation, they claim that the EPA did consider the NJCMP and rejected it. Defendants argue that the NJCMP cannot be the basis for a remand, because the EPA was clearly not obligated to accept the NJCMP.

The court concludes that the NJCMP certainly should have been considered by the EPA in its deliberations and that reasons should have been clearly articulated for deviating from the program articulated in the state plan. However, here, again, there is a factual issue which cannot be resolved on this motion for summary judgment: whether or not the New Jersey Coastal Management Program was considered. The court will deny plaintiff's motion for summary judgment with respect to this issue.

### E. Purposes of Section 404(c) Review

Russo contends that the EPA cannot properly invoke Section 404(c) to veto the Corps's grant of an after-the-fact permit in this case, at least with respect to the 44-acre parcel which has already been developed and with respect to the 8.5 acres of the 13.5-acre parcel which have already been filled. Because of the court's decision that the veto of the 44 acre parcel is void, the question concerns only the 8.5 acre tract. Plaintiff notes that the language of 404(c) is prospective, and argues that the veto power given to the EPA under the section was meant only to *prevent* filling activities which "will have an unacceptable adverse impact" on wetlands wildlife. Once a discharge has occurred, plaintiff argues that Sec. 404(c) is no longer applicable and that the EPA must then turn to its enforcement powers under 33 U.S.C. Sec. 1319. Thus, plaintiff contends that Sec. 404(c) is meant to be only preventive in nature, and not punitive. Plaintiff argues that if Sec. 404(c) is permitted to be used as a punitive weapon for discharges which have already occurred, developers may be denied the procedural protections afforded by the enforcement provisions of the Clean Water Act in which the government bears the burden of proof, as opposed to an arbitrary and capricious standard of review for an administrative veto under Sec. 404(c).

Defendant addresses the above argument only in a footnote, and contends that Section 404(c) applies to after-the-fact permits. Defendant argues that to hold otherwise would be to make it easy for unscrupulous developers to evade the jurisdiction of the EPA by simply filling wetlands in secrecy and forcing the EPA to bring costly enforcement actions.

The submissions of the parties are insufficient for the court to resolve this issue. The parties are directed to submit supplemental briefs within thirty days, citing, if available, appropriate legislative history.

### F. National Headwaters Permit

■ Russo contends that the National Headwaters Permit automatically applied to its property and authorized the discharges onto the land. Defendants counter that the permit did not apply by its own

terms, and that even if it did, individual permits were still required for the discharges.

Several issues are raised by these arguments. First, the court must determine whether the properties were tidal or non-tidal. Plaintiff contends that defendants' own reports characterize the land as non-tidal, and thus that they cannot assert that the National Headwaters Permit does not apply because the land is tidal. Defendants assert that if the National Headwaters Permit applies to the property, the Rivers and Harbors Act would require a permit as well. Plaintiff counters that even if the Rivers and Harbors Act applies to require a permit from the Corps, it was ultimately granted a permit by the Corps and the EPA would have no veto authority over the grant of the permit under the Rivers and Harbors Act.

The court concludes that an issue of fact exists as to whether the property at issue was tidal or non-tidal, and thus that summary judgment in plaintiff's favor would be inappropriate.

### G. EPA's Reliance on Certain Maps and Reports

 Russo challenges the propriety of the reliance of the EPA on certain maps and engineering reports which it contends were not meant for regulatory use in determining whether the properties in question were wetlands. The EPA first states that it was appropriate for it to use the maps and reports, and also contends that the particular maps and reports were not "key" elements of the veto decision and thus that their use was not an abuse of discretion.

The court concludes that the use of the contested maps and reports, even if inappropriate, is not in itself a basis for a finding that the government's assertion of wetlands jurisdiction was improper. If a proper basis for the defendants' decisions existed, then their reliance on certain inappropriate maps and reports would be immaterial. In any event, the court has already indicated above that factual issues regarding the determination that the property was wetlands preclude summary judgment on the jurisdictional issue, and the court will deny plaintiff's cross-motion.[2]

### H. Impartiality of the EPA

Russo challenges the impartiality of the EPA, contending that the Section 404(c) veto was not considered by an impartial body. Rather, plaintiff argues that the EPA representatives repeatedly made misrepresentations regarding the good faith of Russo, went out of their way to find reasons to disapprove the Corps permit, and vetoed the permit solely as a gesture towards pacifying environmentalist groups and making up for their history of poor enforcement. Defendants contest plaintiff's assertions of bias.

If the administrative record supports the EPA's conclusion, then the motives of the EPA officers may not be relevant. Under the unique facts and circumstances of this case, however, plaintiff should be afforded the opportunity of demonstrating bias and improper behavior directed against plaintiff if relevant to any of the remaining issues in this matter.

### CONCLUSION

The court, for the reasons discussed, denies defendants' motion to dismiss plaintiff's claims. The court grants plaintiff's motion in part for partial summary judgment, concluding that the Corps acted outside its authority in refusing to process the application for a permit for the 13.5 acre parcel without the 44 acre parcel. Plaintiff is directed to submit an order consistent with this opinion forthwith.

2. Although the use of the maps may not have been in error because there were other maps which were relied upon by the EPA, the engineering reports seem to be the only resource used by the EPA in determining the hydrology of the soil on the property before any discharges occurred. Plaintiff should be given the opportu-

nity to present extra-record evidence of the intended meaning of terms in the report in order to demonstrate whether the report was improperly relied upon by the EPA in determining that the properties were wetlands subject to federal jurisdiction.