UNITED STATES of America, Plaintiff,

v.

EASTERN OF NEW JERSEY, INC., and Eastern of New Jersey Terminals, Inc., Defendants.

Civ. A. No. 90–3809.

United States District Court, D. New Jersey.

July 24, 1991.

966

Michael Chertoff, U.S. Atty., Jerome L. Merin, Asst. U.S. Atty., Newark, N.J., for the Government.

Richard B. Stewart, Asst. Atty. Gen., Peter M. Flynn, Trial Atty., U.S. Dept. of Justice, Environmental and Natural Resources Div., Washington D.C., for the Government.

Jerome Stein, Stein, Bliablias, McGuire, Pantages & Gigl, Livingston, N.J., Christopher Harris, Gary Fremerman, Thelen, Marrin, Johnson & Bridges, Washington D.C., for defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by the United States of America (the "Government") against Eastern of New Jersey, Inc. and Eastern of New Jersey Terminals, Inc. (collectively, "Eastern") for injunctive relief and civil penalties pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6921 *et seq.*, and the regulations promulgated thereunder.[1] Jurisdiction is alleged pursuant to 42 U.S.C. § 6928 and 28 U.S.C. §§ 1331, 1345 and 1355 and appears to be appropriate.

Currently before the court are several motions by the Government and Eastern for summary judgment pursuant to Fed. R.Civ.P. 56. Eastern moves for summary judgment on all Claims in the Amended Complaint except the Twelfth Claim. The Government moves for summary judgment on all Claims in the Amended Complaint.[2]

---

1. The Government's initial complaint was filed 24 September 1990. On 26 December 1990, the Government filed an amended complaint (the "Amended Complaint"). Eastern filed its answer (the "Answer") on 17 January 1991. The Government has notified the State of New Jersey of the commencement of this action pursuant to 42 U.S.C. § 6928(a)(2). Amended Complaint, ¶ 4.

2. The Government has submitted the following in support of its motions and in opposition to Eastern's motions: Plaintiff United States' Response to Defendants' Motion for (Partial) Summary Judgment Concerning Counts 10, 11, 13, 14 and 15, and Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment as to Counts 10, 11, 12, 13, 14 and 15 ("Gov't Response"); Memorandum of the United States in Opposition to Eastern's Motion for Partial Summary Judgment and in Support of the Cross–Motion of the United States for Partial Summary Judgment as to Count 1 Through 9 ("Gov't Brief"); Reply to Eastern's Opposition to the United States' Motion for Summary Judgment as to Hazardous Waste Fuel Claims; Reply to Eastern's Opposition to the United States' Motion for Summary Judgment as to the Off–Specification Used Oil Claims ("Gov't Off–Specification Reply"); Declaration of Peter M. Flynn, T.A. ("Flynn Decl."); Declaration of John Wilk; Declaration of Robert Morrell; Declaration of Norman J. Weinstein; and Statement of Undisputed and Disputed Material Facts Relating to Plaintiff United States Memorandum in Support of its Opposition and Cross–Motion for Summary Judgment as to Counts 1 Through 9. In addition, the Government has submitted, by letter ("Gov't Letter") dated 22 July 1991 and after oral argument and pursuant to the court's request, additional excerpts from a deposition.

Eastern has submitted the following: Defendant's Brief in Support of its Motion for Summary Judgment Concerning the 10th, 11th, 13th, 14th and 15th Claims Contained in the Government's Complaint ("Def. Brief"); Defendants' Brief in Support of their Motion for Summary Judgment Concerning the First Nine Claims in

For the reasons set forth below, both the Government's and Eastern's motions for summary judgment with respect to the First through Ninth Claims are denied. Summary judgment is granted in favor of the Government dismissing Eastern's defense of estoppel. Summary judgment is further granted in favor of the Government with respect to the Tenth Claim. Both the Government's and Eastern's motions for summary judgment with respect to the Eleventh, Twelfth and Thirteenth Claims are denied. Summary judgment is granted in favor of the Government with respect to the Fourteenth Claim to the extent it alleges Eastern failed to maintain a log pursuant to 40 C.F.R. § 266.43(b)(6)(i); summary judgment is granted in favor of Eastern with respect to the Fourteenth Claim to the extent it alleges Eastern failed to retain analyses pursuant to 40 C.F.R. § 266.43(b)(6)(i). In addition, the Fifteenth Claim is dismissed as having been withdrawn.

## Facts

Eastern of New Jersey, Inc. and Eastern of New Jersey Terminals, Inc. are corporations organized under the laws of New Jersey. They jointly own, maintain and operate a place of business (the "Facility") in Jersey City, New Jersey. Eastern markets fuel oil to industrial and non-industrial fuel oil consumers, or "burners," and other fuel oil marketers. Eastern's customers include school, churches, geriatric centers, apartment buildings and public agencies. Eastern also purchases reprocessed used or waste oil, which is then blended with virgin oil at the Facility and resold. Eastern receives used oil from several suppliers, in-

the Government's Complaint ("Def. Motion Brief"); Eastern's Reply Brief in Support of its Motion for Summary Judgment Concerning the 10th, 11th, 13th, 14th and 15th Claims Contained in the Government's Amended Complaint and Eastern's Response to the Government's Cross–Motion for Partial Summary Judgment as to Counts 10, 11, 12, 13, 14 and 15 ("Def. Reply"); Eastern's Memorandum in Support of its Motion for Summary Judgment Concerning the First Nine Claims of the Government's Complaint and in Opposition to the Government's Cross–Motion for Partial Summary Judgment as to Claims 1 Through 9 ("Def. Opp."); and Statement of Undisputed Material Facts Relating to Defendants' Brief in Support of their Motion for Summary Judgment Concerning the First Nine Claims in the Government's Complaint.

In addition, Eastern has submitted the following declarations and certification, which were annexed as exhibits to the Def. Opp.: Declaration of Paul E. Wyszkowski ("Wyszkowski Decl."); Declaration of Beth–Ann Blum ("Blum Decl."); Declaration of Robert Scheibe ("Sheibe Decl."); Declaration of John S. Kiley ("Kiley Decl."); Declaration of Jane E. Cannavale ("Cannavale Decl."); Declaration of David W. Bright ("Bright Decl."); Declaration of Gordon Michaels ("Michaels Decl."); Declaration of David W. Brady ("Brady Decl."); Declaration of David Schubert ("Schubert Decl."); Declaration of John H. Weidmann ("Weidmann Decl."); Declaration of John DeRoide ("DeRoide Decl."); Declaration of Niels L. Nielson ("Nielson Decl."); Declaration of Ken Goldner ("Goldner Decl."); Declaration of John Wagner ("Wagner Decl."); Declaration of Gary L. Wilson ("Wilson Decl."); Certification of John Lionetti ("Lionetti Cert."); Declaration of Frank LoBello, Jr. ("LoBello, Jr. Decl."). The following affidavits were annexed to the Def. Brief: Affidavit of Frank LoBello, Sr. ("LoBello, Sr. Aff."); Affidavit of Joseph Bocchino ("Bocchino Aff."); Affidavit of John Lionetti ("Lionetti Aff."); Affidavit of Linda Wyckoff ("Wyckoff Aff.").

Eastern has also made several submissions after the briefing on these motions was completed. Eastern has submitted a letter, dated 12 July 1991, discussing an unrelated Environmental Protection Agency enforcement proceeding. Eastern has also submitted a letter, dated 18 July 1991, enclosing the following declarations and affidavits: Declaration of Donald G. Mason ("Mason Decl."); Declaration of Wilma Ann Januck ("Januck Decl."); Declaration of David F. Griffith ("Griffith Decl."); Declaration of James J. Vouglitois ("Vouglitois Decl."); Affidavit of H.P. Lindabury, III ("Lindabury Aff."); Declaration of Arthur E. Malanga ("Malanga Decl."); Declaration of Scott Dunsmore ("Dunsmore Decl."); Affidavit of Charles E. Kahler ("Kahler Aff."); Declaration of John F. Zajac ("Zajac Decl."); Declaration of Larry E. Samms ("Samms Decl."). These declarations and affidavits were apparently not submitted by Eastern to the Clerk of the Court for filing, although they were forwarded by chambers to the Clerk. In addition, Eastern's 18 July 1991 letter encloses a letter from Joseph Bocchino to Eastern dated 15 July 1991.

Eastern's letter with enclosures dated 18 July 1991 was received by the court on 19 July 1991, only one business day prior to oral argument on 22 July 1991. Significantly, all but one of the declarations and affidavits were signed at least two weeks before they were submitted to the court. Indeed, three of the declarations were signed in June 1991. It is unprofessional to conduct litigation in this manner, especially when there was no time restriction on either party to complete the moving and opposition papers for these motions.

cluding Lionetti Oil Recovery, Inc. ("Lionetti"), L & L Oil Service Inc. ("L & L") and B & L Oil Corp ("B & L").

It is uncontroverted Eastern was not regulated under RCRA until 1985, when the regulations promulgated under RCRA were issued. *See* 40 Fed.Reg. 49,164 (1985) (codified at 40 C.F.R. pts. 261, 264, 265, 266 & 271). As part of its effort to ensure compliance with the RCRA regulations, on 8 April 1987, the Environmental Protection Agency (the "EPA") conducted an inspection of the Facility. The EPA collected several samples of oil from tanks at the Facility. *See* Def. Motion Brief, Exhibit C (EPA report on inspection of Eastern). For example, the EPA collected a sample from Tank Number 30 at the Facility. Tank Number 30 contained reprocessed used oil which Eastern obtained from its suppliers and intended to blend with virgin oil. A test of that sample purportedly indicated the sample contained halogens in amounts greater than one thousand parts per million ("ppm"). *See* Def. Motion Brief, Exhibit C (EPA report, dated July 1988, regarding 8 April 1987 inspection of Facility); *see also* Flynn Decl., Exhibit E. That sample also allegedly contained significant concentrations of individual chlorinated solvents such as tetrachloroethylene and 1,1,1–trichloroethane. The sample also purportedly contained concentrations of lead in excess of the specification requirement for lead pursuant to 40 C.F.R. § 266.40(e).

On 7 July 1987, Eastern notified the EPA pursuant to 40 C.F.R. § 266.43(b)(3) of its used oil management activities. Answer, ¶ 92. Subsequently, the EPA sent to Eastern a questionnaire, dated 14 February 1989, pursuant to 42 U.S.C. § 6927,[3] seeking information regarding Eastern's used oil marketing activities. *See* Def. Brief, Exhibit R (questionnaire and Eastern's response). On 28 February 1989, the EPA

conducted a second inspection of the Facility. *See* Def. Brief, Exhibit B ("Wilk Deposition") at 26–27.

Eastern concedes receiving used oil which was "off-specification used oil fuel." Off-specification used oil fuel means the used oil contained amounts of certain hazardous materials in excess of the amounts set forth in 40 C.F.R. § 266.40(e). Eastern, however, contends none of the oil sold to their customers was off-specification used oil fuel. Answer, ¶ 47. In contrast, the Government alleges the oil marketed to Eastern's customers was off-specification used oil fuel. Amended Complaint, ¶ 50.

The Government has brought fifteen Claims against Eastern in the Amended Complaint. The first nine Claims are brought under 40 C.F.R. Part 266, Subpart D, which governs the burning of hazardous waste for energy recovery. In the First Claim, the Government contends Eastern failed to notify the EPA of its hazardous waste fuel activities pursuant to 40 C.F.R. § 266.34(b) and 50 Fed.Reg. 49,164. Amended Complaint, ¶¶ 55–56. In the Second Claim, the Government contends Eastern failed to obtain from its customers the required certifications pursuant to 40 C.F.R. § 266.34(e)(1). Amended Complaint, ¶¶ 59–60. Under 40 C.F.R. § 266.34(e)(1), Eastern's customers would have to certify either that they have notified the EPA of their use of hazardous waste as fuel or that, if the customer is a burner, then the hazardous waste oil sold by Eastern will be burned only in an industrial furnace or boiler identified in 40 C.F.R. § 266.31(b). *See* Amended Complaint, ¶ 59.

In the Third Claim, the Government contends Eastern failed to provide the required certification to other oil marketers from whom Eastern accepted waste fuel that Eastern has notified the EPA of its

---

**3.** Section 6927 provides, in pertinent part:

For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designat-

ed by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, shall furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes.....

42 U.S.C. § 6927(a).

hazardous waste fuel activities pursuant to 42 U.S.C. § 6930 and 40 C.F.R. § 266.34(e)(2). Amended Complaint, ¶¶ 63–64. In the Fourth Claim, the Government contends Eastern failed to submit a Part A RCRA permit application or to notify either the EPA or the New Jersey Department of Environmental Protection of its hazardous waste fuel oil storage activities pursuant to 40 C.F.R. §§ 266.34(c) and 270.10(e) and N.J.A.C. 7:26–12.3. Amended Complaint, ¶¶ 67–68. In the Fifth Claim, the Government contends Eastern failed to develop the written waste analysis plan which is required of marketers of hazardous waste fuel oil pursuant to 40 C.F.R. §§ 266.34(c) and 265.13(b) and N.J.A.C. 7:26–9.4(b)(2). Amended Complaint, ¶¶ 71–72.

In the Sixth Claim, the Government contends Eastern has failed to comply with 40 C.F.R. §§ 266.34(c) and 265.112 and N.J.A.C. 7:26–9.8(c), which require marketers of hazardous waste fuel oil and owners or operators of hazardous waste facilities to have a written closure plan. Amended Complaint, ¶¶ 75–76. In the Seventh Claim, the Government contends Eastern has failed to establish financial assurance for closure pursuant to 40 C.F.R. §§ 266.34(c) and 265.143 and N.J.A.C. 7:26–9.10. Amended Complaint, ¶¶ 79–80. In the Eighth Claim, the Government contends Eastern has failed to prepare manifests for the transportation of hazardous waste fuel pursuant to 40 C.F.R. §§ 266.34(d) and 262.20(a) and N.J.A.C. 7:26–7.4(a)(3). Amended Complaint, ¶¶ 83–84. In the Ninth Claim, the Government contends Eastern has failed to retain certain certifications pursuant to 40 C.F.R. § 266.34(f). Amended Complaint, ¶ 87–88.

The Tenth through Fifteenth Claims are brought under 40 C.F.R. Part 266, Subpart E, which governs the burning of used oil for energy recovery. In the Tenth Claim, the Government contends Eastern has failed to file with the EPA a timely notification of their used oil activities pursuant to 40 C.F.R. § 266.43(b)(3) and 50 Fed.Reg. 49,164. Amended Complaint, ¶¶ 91–92. In addition, the Government contends Eastern has failed to notify the EPA of its activities as marketers of off-specification used oil fuel pursuant to 40 C.F.R. § 266.43(b)(3).

Amended Complaint, ¶ 94. In the Eleventh Claim, the Government contends Eastern failed to obtain from its first customers the required certifications pursuant to 40 C.F.R. § 266.34(b)(5)(i). Amended Complaint, ¶¶ 97–98. Under 40 C.F.R. § 266.34(b)(5)(i), Eastern's customers would have to certify either that they have notified the EPA of their used oil management activities or that, if the customer is a burner, then the off-specification used oil fuel sold by Eastern will be burned only in an industrial furnace or boiler identified in 40 C.F.R. § 266.41(b). *See* Amended Complaint, ¶ 97.

In the Twelfth Claim, the Government contends Eastern has failed to provide the required certification to the first oil marketers from whom it accepted waste fuel that Eastern has notified the EPA of its used oil management activities pursuant to 40 C.F.R. § 266.43(b)(5)(ii). Amended Complaint, ¶¶ 101–02. In the Thirteenth Claim, the Government contends Eastern has failed to utilize invoices which complied with 40 C.F.R. § 266.43(b)(4), 40 C.F.R. § 266.43(b)(i)–(vi) and 50 Fed.Reg. 49,164. Amended Complaint, ¶¶ 105–06. In the Fourteenth Claim, the Government contends Eastern has failed to retain analyses or operating logs of its used oil shipments pursuant to 40 C.F.R. § 266.43(b)(6)(i). Amended Complaint, ¶¶ 109–10. In the Fifteenth Claim, the Government contends Eastern has failed to retain copies of invoices and certifications pursuant to 40 C.F.R. § 266.43(b)(6)(ii).

The Government seeks injunctive relief pursuant to 42 U.S.C. § 6928(a) directing Eastern to comply with all applicable requirements under RCRA and the regulations promulgated thereunder. In addition, the Government seeks an award of civil penalties under 42 U.S.C. § 6928(g) in an amount not to exceed $25,000.00 for each day of each violation by Eastern of RCRA and the regulations promulgated thereunder.

*Discussion*

**A. Summary Judgment Standard of Review**

To prevail on a motion for summary judgment, the moving party must establish

"there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present court's task is to determine whether disputed issues of fact exist, but a district court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College,* 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989). " 'Any 'unexplained gaps' in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'* ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby*: "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving

party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

■ When opposing parties both move for summary judgment on the same issues, as in this case, a district court may not assume there are no genuine issues of material fact and the dispute cannot be decided as a matter of law unless the parties so agree. *Fanty v. Pennsylvania*, 551 F.2d 2, 12 (3d Cir.1977) (Hunter, J., dissenting) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); 6 J. Moore, Federal Practice ¶ 56.13 (2d ed. 1976); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2720 (1973)), *cert. denied sub nom.*, 440 U.S. 957, 99 S.Ct. 1497, 59 L.Ed.2d 770 (1979).

## B. Regulatory Framework

This action involves governmental regulation of used oil. Under RCRA, the EPA was charged with the tasks of developing and promulgating criteria for identifying hazardous waste and promulgating standards for the handling of hazardous waste in order to protect human health and the environment. *See* 42 U.S.C. §§ 6921 & 6922. Subsequent amendments to RCRA also charged the EPA with the task of promulgating regulations governing the use of hazardous waste as fuel. *See* 42 U.S.C. § 6924(q). Accordingly, the EPA promulgated regulations governing the burning of hazardous wastes for energy recovery. *See* 40 C.F.R. Part 266, Subpart D ("Subpart D"). In addition, the EPA promulgated regulations governing the burning of used oil for energy recovery. *See* 40 C.F.R. Part 266, Subpart E ("Subpart E"). Used oil is defined as "any oil that has been refined from crude oil, used, and, as a result of such use, is contaminated by physical or chemical impurities." 40 C.F.R. § 266.40(b); *see* 40 C.F.R. § 266.-40(a) ("Used oil fuel includes any fuel produced from used oil by processing, blending or other treatment.").

Subpart D regulates the marketing of hazardous wastes. Under Subpart D, "[p]ersons who market hazardous waste fuel are termed 'marketers'.... Marketers include generators who market hazardous waste fuel directly to a burner, persons who receive hazardous waste from generators and produce, process, or blend hazardous waste fuel from these hazardous wastes, and persons who distribute but do not process or blend hazardous waste fuel." 40 C.F.R. § 266.34. A marketer may market hazardous waste fuel only:

. . . . .

(1) To persons who have notified EPA of their hazardous waste fuel activities and have a U.S. EPA Identification Number; and

(2) If the fuel is burned, to persons who burn the fuel in boilers or industrial furnaces identified in paragaraph [sic] (b) of this section.

40 C.F.R. § 266.31(a). Hazardous waste fuel may be burned only in certain devices. *See* 40 C.F.R. § 266.31(b)–(c).

The EPA has also promulgated certain regulations governing the activities of marketers of hazardous wastes, including the following:

(e) *Required notices.* (1) Before a marketer initiates the first shipment of hazardous waste fuel to a burner or another marketer, he must obtain a one-time written and signed notice from the burner or marketer certifying that:

(i) The burner or marketer has notified EPA and identified his waste-as-fuel activities, and

(ii) If the recipient is a burner, the burner will burn the hazardous waste fuel only in [a]n industrial furnace or boiler identified in § 266.31(b).

(2) Before a marketer accepts the first shipment of hazardous waste fuel from another marketer, he must provide the other marketer with a one-time written and signed certification that he has notified EPA under section 3010 of RCRA and identified his hazardous waste fuel activities; and

(f) *Recordkeeping.* In addition to the applicable recordkeeping requirements of

Parts 262, 264, and 265 of this chapter, a marketer must keep a copy of each certification notice he receives or sends for three years from the date he last engages in a hazardous waste fuel marketing transaction with the person who sends or receives the certification notice. 40 C.F.R. § 266.34(e)–(f).

As mentioned, the EPA has also promulgated certain regulations governing the marketing and burning of used oil for energy recovery. *See* Subpart E; *see also* 40 C.F.R. § 266.43(a) (defining "marketer" of used oil fuel). Generally, used oil which is also a hazardous waste is excluded from regulation under Subpart D and is included under Subpart E. 40 C.F.R. § 266.30(b)(1).[4] Under Subpart E:

(d) Used oil burned for energy recovery is subject to regulation under this subpart rather than as a hazardous waste fuel under Subpart D of this part if it is a hazardous waste solely because it:

(1) Exhibits a characteristic of hazardous waste identified in Subpart C of Part 261 of this chapter, provided that it is not mixed with a hazardous waste; or

(2) Contains hazardous waste generated only by a person subject to the special requirements for small quantity generators under § 261.5 of this chapter.

40 C.F.R. § 266.40(d). Significantly, however, not all used oil burned for energy recovery is excluded from regulation under Subpart D. Subpart E also provides, in pertinent part:

... *[U]sed oil that is mixed with hazardous waste and burned for energy recovery is subject to regulation as hazardous waste fuel under Subpart D of*

*Part 266.* Used oil containing more than 1000 ppm of total halogens is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in Subpart D of Part 261 of this chapter. Persons may rebut this presumption by demonstrating that the used oil does not contain hazardous waste (for example, by showing that the used oil does not contain significant concentrations of halogenated hazardous constituents listed in Appendix VIII of Part 261 of this chapter).

40 C.F.R. § 266.40(c) (emphasis added).

As mentioned, "off-specification used oil fuel" is defined as used oil fuel which exceeds *any* specification level set forth in 40 C.F.R. § 266.40 at table. *See* 40 C.F.R. § 266.40(c). The EPA has also promulgated certain regulations governing the marketing of off-specification used oil fuel. Subpart E provides, in pertinent part:

(e) Except as provided by paragraph (c) of this section, used oil burned for energy recovery, and any fuel produced from used oil by processing, blending, or other treatment, is subject to regulation under this subpart unless it is shown not to exceed any of the allowable levels of the constituents and properties in the specification shown in the following table. Used oil fuel that meets the specification is subject only to the analysis and recordkeeping requirements under § 266.43(b)(1) and (6). Used oil fuel that exceeds any specification level is termed "off-specification used oil fuel".

USED OIL EXCEEDING ANY SPECIFICATION LEVEL IS SUBJECT TO THIS SUBPART WHEN BURNED FOR ENERGY RECOVERY

---

**4.** Section 266.30(b) provides, in pertinent part:

(b) The following hazardous wastes are not subject to regulation under this subpart:

(1) Used oil burned for energy recovery that is also a hazardous waste solely because it exhibits a characteristic of hazardous waste

identified in Subpart C of Part 261 of this chapter. Such used oil is subject to regulation under Subpart E of Part 266 rather than this subpart....

40 C.F.R. § 266.30(b).

| Constituent/property | Allowable level |
|---|---|
| Arsenic............... | 5 ppm maximum |
| Cadmium............... | 2 ppm maximum |
| Chromium.............. | 10 ppm maximum |
| Lead.................. | 100 ppm maximum |
| Flash Point........... | 100 °F minimum |
| Total Halogens........ | 4,000 ppm maximum |

40 C.F.R. § 266.40(e) (footnotes omitted). Under Subpart E:

(a) A person may market off-specification used oil for energy recovery only:

(1) To burners or other marketers who have notified EPA of their used oil management activities stating the location and general description of such activities, and who have an EPA identification number; and

(2) To burners who burn the used oil in an industrial furnace or boiler identified in paragraph (b) of this section.

40 C.F.R. § 266.41(a). Like hazardous waste under Subpart D, off-specification used oil may be burned for energy recovery only in certain devices. *See* 40 C.F.R. § 266.41(b).

Marketers of used oil fuel and off-specification used oil fuel are subject to the following requirements:

(b) ... (1) *Analysis of used oil fuel.* Used oil fuel is subject to regulation under this subpart unless the marketer obtains analyses or other information documenting that the used oil fuel meets the specification provided under § 266.40(e).

(2) *Prohibitions.* The prohibitions under § 266.41(a);

(3) *Notification.* Notification to EPA stating the location and general description of used oil management activities. Even if a marketer has previously notified EPA of his hazardous waste management activities under section 3010 of RCRA and obtained a U.S. EPA Identification Number, he must renotify to identify his used oil management activities.

(4) *Invoice System.* When a marketer initiates a shipment of off-specification used oil, he must prepare and send the receiving facility an invoice containing the following information:

(i) An invoice number;

(ii) His own EPA identification number and the EPA identification number of the receiving facility;

(iii) The names and addresses of the shipping and receiving facilities;

(iv) The quantity of off-specification used oil to be delivered;

(v) The date(s) of shipment or delivery; and

(vi) The following statement: "This used oil is subject to EPA regulation under 40 C.F.R. Part 266";

(5) *Required Notices.* (i) Before a marketer initiates the first shipment of off-specification used oil to a burner or other marketer, he must obtain a one-time written and signed notice from the burner or marketer certifying that:

(A) The burner or marketer has notified EPA stating the location and general description of his used oil management activities; and

(B) If the recipient is a burner, the burner will burn the off-specification used oil only in an industrial furnace or boiler identified in § 266.41(b); and

(ii) Before a marketer accepts the first shipment of off-specification used oil from another marketer subject to the requirements of this section, he must provide the marketer with a one-time written and signed notice certifying that he has notified EPA of his used oil management activities; and

(6) *Recordkeeping—*(i) *Used oil fuel that meets the specification.* A market-

er who first claims under paragraph (b)(1) of this section that used oil fuel meets the specification must keep copies of analysis [sic] (or other information used to make the determination) of used oil for three years. Such marketers must also record in an operating log and keep for three years the following information on each shipment of used oil fuel that meets the specification. Such used oil fuel is not subject to further regulation, unless it is subsequently mixed with used oils so that it no longer meets the specification.

(A) The name and address of the facility receiving the shipment;

(B) The quantity of used oil fuel delivered;

(C) The date of shipment or delivery; and

(D) A cross-reference to the record of used oil analysis (or other information used to make the determination that the oil meets the specification) required under paragraph (b)(6)(i) of this section.

(ii) *Off-specification used oil fuel.* A marketer who receives or initiates an invoice under the requirements of this section must keep a copy of each invoice for three years from the date the invoice is received or prepared. In addition, a marketer must keep a copy of each certification notice that he receives or sends for three years from the date he last engages in an off-specification used oil fuel marketing transaction with the person who sends or receives the certification notice.

40 C.F.R. § 266.43(b) (note omitted).

In essence, this regulatory scheme creates three tiers of regulation of used oil: "Hazardous used oil is regulated strictly, off-specification used oil is regulated less strictly, and specification used oil is regulated only slightly." *Hazardous Waste Treatment Council v. United States Environmental Protection Agency,* 861 F.2d 277, 288 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). The court in *Hazardous Waste*

*Treatment Council,* in upholding the regulations and the propriety of their promulgation, noted: "This regulatory scheme reflects the EPA's expert judgment concerning the amount of regulation necessary to protect human health and the environment from the adverse effects of various types of used oil." *Id.*

RCRA provides several means for the EPA to enforce the regulations promulgated under RCRA. For example, the EPA may seek a compliance order:

(1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person has violated or is in violation of any requirement of this subchapter, the [EPA] may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified time period, or both, or the [EPA] may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

. . . . .

42 U.S.C. § 6928(a)(1). In addition, the EPA may seek criminal penalties for violations of RCRA. *See* 42 U.S.C. § 6928(d). The Government in this case, however, has sought to have a civil penalty imposed upon Eastern pursuant to 42 U.S.C. § 6928(g), which provides: "Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." *Id.*

As mentioned, Eastern moves for summary judgment with respect to the First through Eleventh, Thirteenth and Fourteenth Claims in the Amended Complaint. The Government moves for summary judgment with respect to the First through Fourteenth Claims in the Amended Complaint.[5] The First through Ninth Claims

---

**5.** The Government and Eastern originally moved for summary judgment with respect to

the Fifteenth Claim. The Government, however, has since represented it "is no longer pur-

are brought under Subpart D, while the Tenth through the Fourteenth Claims are brought under Subpart E.

■ Determination of these summary judgment motions requires the interpretation of the relevant regulations promulgated under RCRA. It has been noted that a court interpreting an administrative agency's rules must look to "the plain words of the regulation and any relevant interpretations of the Administrator." 2 K. Davis, Administrative Law Treatise § 7.22 (2d ed. 1979) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *see New York State Comm'n on Cable Television v. FCC*, 571 F.2d 95, 98 (2d Cir.) ("look to the 'common sense' of the ... regulation, to its purpose, to the practical consequences of the suggested interpretations, and to the agency's own interpretations"), *cert. denied*, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). The administrative agency's interpretation of its own rule is controlling unless it is plainly erroneous or inconsistent with the regulation. K. Davis, *supra* at § 7:22.

■ Significantly, a regulation must be interpreted in a manner which would effectuate the purpose of the administrative agency which promulgated the regulation.[6] *United States v. Unitank Terminal Serv.*, 724 F.Supp. 1158, 1165 (E.D.Pa. 1989). Any ambiguity in a regulation must therefore be resolved in a manner consistent with the statutory and regulatory scheme. *Id.* In addition, a court must

bear in mind the practical effects of its interpretation of the regulation. *Id.*; *see New York State Comm'n*, 571 F.2d at 98. The preamble to a regulation may be relevant to interpreting the regulation. *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 158, 102 S.Ct. 3014, 3025, 73 L.Ed.2d 664 (1982); *Unitank*, 724 F.Supp. at 1165.

There does not appear to exist any controlling EPA interpretations of the relevant regulations apart from the preambles to the regulations.[7] The only court decision addressing Subpart D and Subpart E merely held the regulations were properly promulgated. *See Hazardous Waste Treatment Council*, 861 F.2d at 288. Therefore, the issues raised by these summary judgment motions will depend upon an interpretation of the relevant regulations in light of their plain meaning and regulatory purpose.

### C. The First through Ninth Claims

Eastern moves for summary judgment with respect to the First through Ninth Claims on two grounds. First, Eastern contends the Government cannot trace the source of the oil sampled on 8 April 1987. Def. Brief at 6. Therefore, Eastern argues, the Government cannot show that the oil sampled is subject to regulation under Subpart D because the Government cannot show that the sampled oil did not come from small quantity generators exempted from Subpart D.[8] *Id.* at 6–7. Second, Eastern argues the Government is estopped from bringing claims under Sub-

suing" this Claim. Gov't Off–Specification Reply at 1 n. 1. Accordingly, the Fifteenth Claim is dismissed and will not be considered in this opinion.

6. Similarly, a regulation is deemed "ineffective" when it conflicts with the statute it is intended to effectuate. *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n*, 866 F.2d 616, 623 (3d Cir.1989).

7. Eastern has submitted various EPA publications and internal documents regarding used oil regulation. *See* Def. Brief, Exhibits E ("Waste Oil Interim Enforcement Guidance" memorandum), G ("RCRA Inspection Manual"), H ("Straight Talk on Tanks: A Summary of Leak Detection Methods for Petroleum Underground Storage Tank Systems"), I ("Understanding the

Small Quantity Generator Hazardous Waste Rule: A Handbook for Small Business") and J ("Information Bulletin for Public Release: EPA Concerns About the Used Oil Recycling System").

8. At oral argument, Eastern restated this contention. Eastern argued it believes that none of its suppliers who may be classified as large quantity suppliers provided Eastern with used oil which was mixed with hazardous waste. Therefore, any hazardous waste found in Eastern's used oil must have come from small quantity generators. Accordingly, Eastern contends it is entitled to exemption from regulation under Subpart D.

part D because Eastern detrimentally relied upon representations made by EPA officials that Eastern had not violated EPA regulations relating to hazardous waste fuel. *Id.* at 12.

The Government argues Subpart D applies to Eastern and there is no genuine issue of material fact that Eastern has violated Subpart D. Gov't Brief at 2. Furthermore, the Government argues the facts as alleged by Eastern do not satisfy the strict standard for applying estoppel principles against the Government. *Id.* The Government moves for summary judgment on the First through Ninth Claims.

### 1. *Applicability of Subpart D*

■ Under Subpart E, "used oil that is mixed with hazardous waste and burned for energy recovery is subject to regulation as hazardous waste fuel under Subpart D...." 40 C.F.R. § 266.40(c). For purposes of determining whether used oil is hazardous waste regulated under Subpart D rather than Subpart E, the regulations under RCRA provide:

> ... Used oil containing more than 1000 ppm of total halogens is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in Subpart D of Part 261 of this chapter. Persons may rebut this presumption by demonstrating that the used oil does not contain hazardous waste (for example, by showing that the used oil does not contain significant concentrations of halogenated hazardous constituents listed in Appendix VIII of Part 261 of this chapter).

*Id.*

It appears Eastern is subject to regulation under Subpart D. It is uncontrovert-ed, for example, that the test of a sample of used oil taken from Tank 30 on 8 April 1987 indicated the oil contained halogens in excess of one thousand ppm. *See* Def. Motion Brief, Exhibit C; Flynn Decl., Exhibit E. Accordingly, it is presumed Eastern's used oil is hazardous waste.

Eastern has attempted to rebut this presumption by introducing statements from some of its suppliers.[9] These suppliers state that none of the used oil they supplied Eastern was hazardous waste under RCRA.[10] *See* LoBello, Sr. Aff., ¶ 4; Bocchino Aff., Exhibit; Lionetti Aff., ¶ 2; Wyckoff Aff., ¶ 2. In addition, several suppliers of Lionetti, L & L and B & L state they did not provide hazardous waste to Lionetti, L & L or B & L.[11] *See* Wyszkowski Decl., ¶ 3; Blum Decl., ¶ 6; Scheibe Decl., ¶ 4; Kiley Decl., ¶ 3; Cannavale Decl., ¶ 3; Bright Decl., ¶ 2; Michaels Decl., ¶ 3; Brady Decl., ¶ 3; Schubert Decl., ¶ 3; Weidmann Decl., ¶ 3; DeRoide Decl., ¶ 3; Nielson Decl., ¶ 3; Goldner Decl., ¶ 3; Wagner Decl., ¶ 3; Wilson Decl., ¶ 3; Mason Decl., ¶ 4; Jancuk Decl., ¶ 3; Griffith Decl., ¶ 3; James J. Vouglitois Decl., ¶ 3; Lindabury Aff., ¶ 3; Malanga Decl., ¶ 5; Dunsmore Decl., ¶ 4; Kahler Aff., ¶ 4; Zajac Decl., ¶ 4; Samms Decl., ¶ 3.

None of the material submitted by Eastern, however, is sufficient to rebut the presumption that Eastern's used oil, because it contains halogens in excess of 1000 ppm, is hazardous waste regulated under Subpart D. Most of the declarations and affidavits submitted by Eastern contain nothing more than conclusory statements that no hazardous waste was shipped to Eastern or its primary suppliers.[12] Indeed,

---

**9.** Eastern concedes it bears the burden of rebutting the presumption that certain waste is hazardous. Def. Brief at 10.

**10.** The Government notes that Eastern's primary suppliers are currently defendants in separate civil actions based on allegations that they shipped hazardous waste fuel oil to their customers. Gov't Brief at 10–11 n. 10. In addition, the Government notes that Eastern has received used oil from other suppliers in addition to Lionetti, L & L and B & L. *See* Deposition of Peter Leiwant at 98 & 102 (attached to Gov't

Letter). Eastern has not submitted statements from its other suppliers regarding the nature of the used oil provided to Eastern.

**11.** It appears these affidavits and declarations are based upon a form supplied by counsel to Eastern which sets forth the statements counsel desires the affiant or declarant to make.

**12.** Some of the material submitted by Eastern includes manifests which indicate used oil shipped to Eastern's suppliers was not hazard-

many of the statements are qualified by language indicating the supplier only believes, as opposed to knows in fact, that used oils shipped to Eastern's suppliers was not hazardous waste. *See, e.g.,* Wyszkowski Decl., ¶ 3; Cannavale Decl., ¶ 3; Michaels Decl., ¶ 3; Wagner Decl., ¶ 3; Januck Decl., ¶ 3; Griffith Decl., ¶ 3; Vouglitois Decl., ¶ 3; Lindabury Aff., ¶ 3; Samms Decl., ¶ 3.

The materials submitted by Eastern do not rebut the presumption that Eastern's used oil is regulated as a hazardous waste under Subpart D. Moreover, it is uncontroverted that at least some of Eastern's used oil contained halogens in excess of 1000 ppm. Therefore, there is no genuine issue of material fact that Eastern's used oil is regulated under Subpart D as hazardous waste. Summary judgment is granted in favor of the Government with respect to the applicability of Subpart D in the First through Ninth Claims.

### 2. *Small Quantity Generator Exemption*

The next relevant issue is whether Eastern is exempt from regulation under Subpart D by virtue of the small quantity generator exemption. *See* 40 C.F.R. § 266.40(d)(2).

#### a. Burden of Proof

■ Eastern contends the sampled oil was not subject to regulation under Subpart D because of the inability of the Government to carry its burden of proving the sampled oil was *not* mixed with hazardous waste from small quantity generators. Def. Brief at 9. Eastern contends Subpart D does not apply to the sampled oil because the sampled oil may have come from small quantity generators, which would make it

exempt from Subpart D. Def. Opp. at 4; *see* 40 C.F.R. § 266.40(d)(2).

Under Subpart E,

[u]sed oil burned for energy recovery is subject to regulation under this subpart rather than as a hazardous waste fuel under Subpart D of this part if it is a hazardous waste solely because it … [c]ontains hazardous waste generated only by a person subject to the special requirements for small quantity generators under § 261.5 of this chapter.

40 C.F.R. § 266.40(d)(2).[13] Although Eastern contends the burden of proving used oil came from small quantity generators rests with the Government, the burden properly rests on the party claiming exemption under section 266.40(d)(2). *See Hazardous Waste Treatment Council,* 861 F.2d at 289. In *Hazardous Waste Treatment Council,* the court held "the burden will be on the holder of the oil to prove that the hazardous waste part of the mixture was produced by a small quantity generator." *Id.* at 289.

■ Eastern makes several arguments in support of its proposition that the burden of proving Eastern is not exempted from regulation under Subpart E rests on the Government. Eastern contends RCRA placed a burden of proof on the regulated entity only with respect to rebutting the presumption that wastes are hazardous under section 266.40(c). Def. Opp. at 7–8. As mentioned, section 266.40(c) creates a rebuttable presumption that used oil is hazardous waste when it is mixed with halogenated hazardous waste and contains more than 1000 ppm of total halogens. 40 C.F.R. § 266.40(c). Significantly, section 266.40(c) does not refer to small quantity generators. Therefore, the rebuttable presumption under section 266.40(c) is inapposite to the burden of proving exemption under section 266.40(d)(2).

Eastern also contends the holding in *Hazardous Waste Treatment Council* placed the burden of proving exemption on

---

ous waste. *See, e.g.,* Lionetti Cert.; Blum Decl.; Cannavale Decl.; Mason Decl.; Kahler Decl.; Samms Decl. Most of the material submitted by Eastern, however, does not include such manifests.

**13.** Under 40 C.F.R. § 261.5, "[a] generator is a conditionally exempt small quantity generator in a calendar month if he generates no more than 100 kilograms of hazardous waste in that month." *Id.* at § 261.5(a).

the regulated entity only with respect to rebutting the presumption that wastes are hazardous under section 266.40(c). Def. Opp. at 7–8. Nowhere in the burden of proof discussion in *Hazardous Waste Treatment Council,* however, did the court mention the rebuttable presumption. Indeed, the language of the court could not be more clear: "[T]he burden will be on the holder of the oil to prove that the hazardous waste part of the mixture was produced by a small quantity generator." *Hazardous Waste Treatment Council,* 861 F.2d at 289.

The argument that the small quantity generator exemption relates to rebutting the presumption of hazardous waste is logically inconsistent with the regulations under RCRA. The rebuttable presumption relates to a means by which waste may be deemed not hazardous. *See* 40 C.F.R. § 266.40(c). In contrast, the small quantity generator exemption relates to whether hazardous wastes are regulated under Subpart D or Subpart E. *See id.* at § 266.-40(d)(2). Significantly, the small quantity generator exemption applies to wastes which are already deemed hazardous. *Id.*

Eastern also argues the preamble to the final version of the rule codified at section 266.40(d)(2) is silent as to which party bears the burden of proving a marketer is exempt from Subpart D. Def. Brief at 10. Eastern argues this silence is telling because other regulations explicitly placed the burden of proof on the marketer or regulated entity. *Id.* In addition, Eastern points out that although the preamble to the proposed rule regarding the exemption of small quantity generators placed the burden on the regulated entity, the burden of proof language was omitted from preamble to the final rule. *Id.* Eastern contends a principle of statutory construction provides that when proposed language is omitted from the final version of a statute, the proposed language is not to be

read into the final version. Def. Brief at 10 (citing *Landers v. National R.R. Passengers Corp.,* 485 U.S. 652, 656 n. 3, 108 S.Ct. 1440, 1442 n. 3, 99 L.Ed.2d 745 (1988); *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 339 n. 8, 108 S.Ct. 1837, 1844 n. 8, 100 L.Ed.2d 349 (1988)).

The principle relied upon by Eastern, however, is inapposite because no statute is being considered. Rather, an administrative rule and a preamble to an administrative rule proposed by a federal agency are being considered. Preambles to regulations are relevant to the construction of the final version of the regulation. *See, e.g., Fidelity Fed. Sav. & Loan Ass'n,* 458 U.S. at 158, 102 S.Ct. at 3025; *Unitank,* 724 F.Supp. at 1165. An examination of the preamble to the proposed version of section 266.40(d)(2) and the preamble to the final version of section 266.40(d)(2) indicates burden of proving exemption is properly placed on the party seeking exemption.

On 11 January 1985, the EPA released proposed rules relating to the regulation of used oil fuel under RCRA. *See* 50 Fed. Reg. 1,684 (to be codified at 40 C.F.R. pt. 266) (proposed 11 January 1985). In the preamble to the proposed rules, the EPA announced it was proposing that used oil generated by a small quantity generator would be regulated as used oil fuel rather than hazardous waste, even if the used oil exhibited some characteristics of hazardous waste or was mixed with some hazardous waste. 50 Fed.Reg. at 1,692. The EPA reasoned that used oil from small quantity generators should not be regulated as a hazardous waste because it is not ordinarily adulterated by the addition of halogens. *Id.*

The EPA reiterated the already codified principle that hazardous wastes which are mixed with ordinary wastes are presumptively classified as hazardous wastes.[14] *Id.*

---

14. The EPA reasoned a presumptive classification scheme was needed to avoid the circumvention of hazardous waste regulations by diluting hazardous wastes with non-hazardous wastes. The EPA noted:

> ... It is important to determine whether a waste fuel is a hazardous waste fuel or a used

oil fuel because they would be regulated differently under today's rule. . . .

> There are situations where it is difficult to tell if a waste is used oil or hazardous waste, particularly when a used oil contains toxic constituents. The [EPA] believes it has discretion to determine whether a waste is to be classified as hazardous waste or as used oil.

at 1,691 (citing 40 C.F.R. § 261.3(a)(2)). Accordingly, used oil mixed with hazardous waste would be presumptively classified and regulated as hazardous waste and not as used oil if it contained chlorine in excess of a certain level.[15] 50 Fed.Reg. at 1,692; see id. at 1,691. In order to avoid regulation of used oil as hazardous waste, the EPA noted:

> A marketer, blender or user might argue that the material is exempt from the hazardous waste regulations and remains a used oil because it was generated by a small quantity generator. *They would have the burden of proof on this issue.* See, e.g., *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 [73 S.Ct. 981, 985, 97 L.Ed. 1494] (1953) (party claiming the benefits of an exception to a broadly remedial statutory or regulatory scheme has the burden of proof to show that they meet the terms of the exception). As part of this burden, they would have to show that the used oil has never been commingled with hazardous waste ... from large quantity generators. Since used oil from small quantity generators is not typically adulterated at these levels, we do not think this burden can be satisfied other than in exceptional cases.

> In exercising this discretion, we are guided by three principles:
> (1) Where possible, clear, objective tests are needed for classifying hazardous waste and used oil;
> (2) The [EPA] should not adopt a scheme whereby most used oil would be classified as a hazardous waste ineligible for regulation under the section 3014 standards; and
> (3) *Any objective test should ensure that a massive adulteration of used oil with hazardous waste results in the mixture being defined as a hazardous waste not eligible for the special standards for recycled oil.*

50 Fed.Reg. at 1,691 (emphasis added, footnotes and citations omitted).

15. The term chlorine as it is used in the regulations is equivalent to the term halogens. The preamble to the regulations notes tests for chlorines actually measure halogens. 50 Fed.Reg. at 49,176.

16. In a footnote to this passage, the EPA sought comments on two issues:

> The [EPA] solicits comments on the extent to which small quantity generators may, in fact, generate used oil containing more than

50 Fed.Reg. at 1,692 (emphasis added, footnote omitted).[16]

The preamble to the final rule did not contain the passage allocating the burden of proving exemption to the party seeking exemption. See 50 Fed.Reg. at 49,178–79. The EPA stated that the comments received regarding the proposed rule indicated small quantity generators were not commonly mixing hazardous waste with used oil. 50 Fed.Reg. at 49,178. Rather than promulgate a rule which exempted used oil from small quantity generators from all regulation, however, the EPA adopted a rule which classified used oil mixed with hazardous waste as hazardous waste. *Id.* at 49,179. The EPA opted to classify such a mixture as hazardous waste for the same reason the EPA created a presumption that certain wastes were hazardous: The EPA sought to avoid promulgating rule which would allow marketers to circumvent regulation by adulterating hazardous waste with non-hazardous waste.[17] *Id.* The EPA, rather than regulating such a mixture as the hazardous waste, opted to regulate the mixture as used oil, despite its classification as hazardous waste. *Id.*

In light of the history and purpose of section 266.40(d)(2), the EPA cannot be said

> 4000 ppm total chlorine because of mixing with chlorinated hazardous waste. Further, given that such mixtures would be regulated as used oil fuel rather than hazardous waste fuel ... the [EPA] solicits comments on whether an allowable level for chlorine ... as an indicator of mixing with chlorinated wastes should be included in the used oil specification to ensure that such adulterated oil ... is not burned in nonindustrial boilers.

50 Fed.Reg. at 1,692 n. 26.

17. The EPA reasoned:

> The final rule states that this type of mixture is to be *classified* as a hazardous waste.... EPA is taking this step for a number of reasons. To do otherwise would create the very situation feared by the commentators whereby the rules would create an incentive to adulterate and be much more difficult to enforce. This is because if small quantity generator waste could be mixed with otherwise-regulated used oil and the mixture was exempt from regulation, people undoubtably would take advantage of the opportunity to escape regulation, or raise the issue of mixing as a defense in enforcement actions.

50 Fed.Reg. at 49,179 (footnote omitted).

to have abandoned the principle that a party seeking exemption bears the burden of proving the applicability of the exemption. The same concern was addressed by the EPA in the preambles to both the proposed and final rules. The EPA was concerned with marketers of used oil circumventing regulation by mixing non-hazardous waste used oil with hazardous waste. Both the final rule and the proposed rule address exempting a mixture of hazardous waste and used oil from regulation. The proposed rule contemplated designating such a mixture as hazardous waste only if it met the requirements of the presumptive classification of hazardous waste. The final rule differed from the proposed rule only by classifying such a mixture as hazardous waste regardless of the presumption. Both the proposed and final rule regulate hazardous waste used oil as used oil and not as hazardous waste.[18] Because the proposed and final rule share the same concerns, the mere absence of the burden of proof language in the preamble to the final rule does not suggest the EPA abandoned the burden of proof issue.

Eastern concedes the EPA ordinarily places the burden of proving an exemption from regulation on the party seeking the exemption. Def. Brief at 11 (citing 40 C.F.R. § 261.2(f)[19]). Eastern, however, contends it is not seeking exemption from regulation. Rather, it contends it is merely seeking to be regulated under Subpart E and not Subpart D. Def. Brief. at 11. The distinction Eastern attempts to make, however, is a distinction without substance. It is apparent Eastern seeks to be exempted from regulation under Subpart D. The fact that Eastern is amenable to being regulated under Subpart E simply has no bearing on whether it is more properly regulated under Subpart D.

18. The EPA retained, in the final rule, the presumptive classification of certain mixtures of hazardous waste and used oil as hazardous waste. 40 C.F.R. § 266.40(c). Consequently, hazardous waste used oil ordinarily regulated as used oil will be regulated as hazardous waste when the amount of halogens in the hazardous waste used oil exceeds a certain level. *Id.*

19. 40 C.F.R. § 261.2(f) provides, in pertinent part:

As mentioned, Eastern has conceded the EPA ordinarily places the burden of proving exemption from regulation on the party seeking the exemption. Def. Brief at 11. Furthermore, the placement of the burden on Eastern in this case is consistent with the general principle that a party seeking exemption from the application of a statute or regulation bears the burden of proving it meets the requirements of the asserted exemption. *See United States v. First City Nat'l Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967); *United States v. Columbus Country Club*, 915 F.2d 877, 882 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991). Accordingly, the next relevant inquiry is whether Eastern has raised a genuine issue of material fact as to whether its marketing of used hazardous waste oil is exempted from regulation under Subpart D because of the small quantity generator exemption.

b. Meeting the Burden of Proving Exemption

██ To be exempted from regulation under Subpart D, Eastern would have "to prove that the hazardous waste part of the mixture was produced by a small quantity generator." *Hazardous Waste Treatment Council*, 861 F.2d at 289; *see* 40 C.F.R. § 266.40(d)(2). Notably, the relevant regulations do not explicitly state whether all or part of a regulated entity's used oil must come from small quantity generators for the exemption to apply. The court in *Hazardous Waste Treatment Council* stated that to be exempted from regulation under Subpart D, a regulated entity would have "to prove that *the hazardous waste part of the mixture* was produced by a small quan-

... Respondents in actions to enforce regulations implementing Subtitle C of RCRA who raise a claim that a certain material is not solid waste, or is conditionally exempt from regulation, must demonstrate that there is a known market or disposition for the material, and that they meet the terms of the exclusion or exemption....

*Id.*

tity generator." 861 F.2d at 289 (emphasis added). Moreover, under Subpart E,

> [u]sed oil burned for energy recovery is subject to regulation under this subpart rather than as a hazardous waste fuel under Subpart D of this part if it is a hazardous waste solely because it ... [c]ontains hazardous waste generated *only* by a person subject to the special requirements for small quantity generators under § 261.5 of this chapter.

40 C.F.R. § 266.40(d)(2) (emphasis added). Section 266.40(d)(2), by the use of the term "only," indicates all the hazardous waste used oil Eastern mixed with virgin oil must have been supplied by small quantity generators in order for Eastern to avail itself to the exemption under section 266.40(d)(2). The decision in *Hazardous Waste Treatment Council* is consistent with the language of section 266.40(d)(2). Accordingly, Eastern can meet its burden of proving exemption only if it shows all, not just part, of its hazardous waste used oil came from small quantity generators.[20]

 Eastern has proffered declarations from two of its suppliers of used oil, Lionetti and L & L, to support its contention

that it receives used oil only from small quantity generators. Lionetti "obtains used oil from both large quantity generators and small quantity generators. The used oil is sold to such places as Eastern and is usually held on site for a one to two-week period." Lionetti Cert., ¶ 2. According to Lionetti, during "the two week period prior to April 7, 1987 EPA inspection of [Lionetti] (March 24, 1987 to April 7, 1987) indicates that a total of 380,559 gallons were received by [Lionetti] of which 104,758 gallons were from large quantity generators. The percentage of waste oil received from small quantity generators, in other words, is 72% of the total and 28% of the total is from large quantity generators." *Id.*

Similarly, L & L appears to receive significant amounts of used oil from small quantity generators. L & L estimates "at least 90 percent of the used oil that L & L collects for recycling is from [ ]small quantity generators.... [T]he percent of the used oil collected by L & L for recycling was approximately the same percentage noted in paragraph 2 during the period

---

**20.** Eastern argues that in determining whether used oil is hazardous, the proportion of halogens attributable to used oil which comes from small quantity generators must be subtracted from the aggregate of the amount of halogens attributable to used oil which comes from both small and large quantity generators. Def. Brief at 9 n. 8 (citing Wilk Deposition at 79–80). This argument might be construed to mean that the exemption from regulation under Subpart D might be available to Eastern at least to the extent a portion of Eastern's used oil came from small quantity generators.

As discussed above, however, Eastern could not argue that the exemption applies when less than all of Eastern's used oil came from small quantity generators. Moreover, the deposition testimony of Wilk suggests he was referring to the rebuttable presumption rather than the exemption. The portion of the deposition testimony of John Wilk ("Wilk"), an EPA official, relied upon by Eastern is as follows:

Q. Could you explain the significance of whether the waste comes from a large quantity generator or small quantity generator?

A. *Under the used oil regulations, if you receive from an exempt small quantity generator, a generator who produces less than 100 kilograms per month of hazardous waste, then, no matter how much halogen it contains,*

*it cannot be applicable to the rebuttable presumption.* In other words, that hazardous waste is not hazardous waste, in other words, it's exempt. If that was [sic] the halogens we were picking up it would not be a hazardous waste, no matter the concentration.

Q. You could subtract that from the total quantity of halogens that might be contained in used oil?

A. If you knew them.

Q. If you knew the percentage, for example, if you picked up used oil from 10 generators, nine of them were small quantity generators and one of them was a large quantity generator and they all produced equal amounts of hazardous waste included in the used oil, you could subtract the quantity of the nine from the quantity, from the overall quantity?

A. You could do that.

Def. Brief, Exhibit B at 79–80 (emphasis added). In the context of Wilk's deposition testimony, it is apparent Wilk was referring to the rebuttable presumption that when used oil exceed a certain level of total halogens, it is rebuttably presumed to be hazardous waste regulated under Subpart D. *See* 40 C.F.R. § 266.40(c). According to Wilk, halogens attributable to used oil from small quantity generators are not considered in determining whether the rebuttable presumption applies.

from January through March, 1987." Lo-Bello, Jr. Decl., ¶¶ 2–3.

Eastern has introduced material suggesting its suppliers receive used oil from purported small quantity generators.[21] None of this material unequivocally indicates, however, that the small quantity generator used oil was actually provided to Eastern. For example, Lionetti merely states that its used oil is "sold to such places as Eastern...." Lionetti Cert., ¶ 2. Significantly, Lionetti does not state its used oil from small quantity generators is actually sold to Eastern. Nonetheless, it appears there is a genuine issue of material fact whether Eastern is exempt from regulation under Subpart D. It is uncontroverted that Lionetti and L & L provide used oil to Eastern. Moreover, it appears significant proportions of Lionetti's and L & L's used oil comes from small quantity generators. Accordingly, summary judgment in favor of either the Government or Eastern is denied with respect to the First through Ninth Claims in the Amended Complaint.

### 3. *Estoppel*

■ Eastern contends that even if it is subject to regulation under Subpart D, the Government should be estopped from asserting the First through Ninth Claims because of misleading and improper conduct on the part of EPA officials. Def. Brief at 12.

■ In order to assert an estoppel defense against the Government, a defendant must show (1) the Government made a misrepresentation (2) upon which the defendant reasonably relied (3) to his or her detriment. *Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80, 88 (3d Cir.1989); *United States v. St. John's Gen.*

*Hospital*, 875 F.2d 1064, 1069 (3d Cir.1989); *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir.1987); *Public Interest Research Group v. Yates Indus., Inc.*, 757 F.Supp. 438, 448 (D.N.J.1991); *Russo Dev. Corp. v. Thomas*, 735 F.Supp. 631, 637 (D.N.J.1989). In addition, a defendant must show affirmative misconduct on the part of the Government. *Equibank*, 884 F.2d at 88; *St. John's Gen. Hospital*, 875 F.2d at 1069; *Asmar*, 827 F.2d at 912; *Public Interest Research Group*, 757 F.Supp. at 448; *Russo Dev. Corp.*, 735 F.Supp. at 637. The burden of proof is on the party claiming estoppel. *Asmar*, 827 F.2d at 912.

The requirement that there must be affirmative misconduct on the part of the Government stems from the principle that "the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (footnote omitted). " '[C]ourts invoke the doctrine of estoppel against the [G]overnment with great reluctance.' " *Equibank*, 884 F.2d at 88 (quoting *United States v. Browning*, 630 F.2d 694, 702 (10th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981)). Indeed, the Supreme Court has noted it has "reversed every finding of estoppel that [it has] reviewed." *Office of Personnel Management v. Richmond*, —— U.S. ——, 110 S.Ct. 2465, 2470, 110 L.Ed.2d 387 (1990), *reh'g denied*, —— U.S. ——, 111 S.Ct. 5, 111 L.Ed.2d 821 (1990).

Eastern contends the Government's failure to apprise Eastern that it had violated the regulations promulgated under RCRA constitutes a misrepresentation.[22] Def.

---

**21.** Neither Lionetti nor L & L discuss why their suppliers are appropriately characterized as small quantity generators under 40 C.F.R. § 261.5. Indeed, the suppliers of Lionetti, L & L and B & L, although they state they did not provide hazardous waste to Lionetti, L & L or B & L, do not state whether they are large or small quantity generators. *See* Wyszkowski Decl., ¶ 3; Blum Decl., ¶ 6; Scheibe Decl., ¶ 4; Kiley Decl., ¶ 3; Cannavale Decl., ¶ 3; Bright Decl., ¶ 2; Michaels Decl., ¶ 3; Brady Decl., ¶ 3; Schubert Decl., ¶ 3; Weidmann Decl., ¶ 3; DeRoide Decl., ¶ 3; Nielson Decl., ¶ 3; Goldner

Decl., ¶ 3; Wagner Decl., ¶ 3; Wilson Decl., ¶ 3; Mason Decl., ¶ 4; Jancuk Decl., ¶ 3; Griffith Decl., ¶ 3; James J. Vouglitois Decl., ¶ 3; Lindabury Aff., ¶ 3; Malanga Decl., ¶ 5; Dunsmore Decl., ¶ 4; Kahler Aff., ¶ 4; Zajac Decl., ¶ 4; Samms Decl., ¶ 3.

**22.** There is no basis upon which Eastern could argue the Government should be estopped from enforcing the regulation for the period from the effective date of the regulations to April 1987. Eastern concedes it had no contact with the Government regarding the RCRA regulations

Brief at 22. Eastern contends the Government failed to apprise it of the possible violations, even after Eastern specifically inquired. *Id.* Eastern contends it reasonably relied upon the Government's representation that Eastern was in compliance with the regulations promulgated under RCRA because the regulations were confusing.[23] Def. Brief at 22. Eastern contends its reliance was detrimental because had it known it was in violation of the regulations under RCRA, it would have acted either to comply with the regulations, to show it was not marketing hazardous waste or to settle any issue of possible liability. Def. Brief at 23.

■ Even assuming the Government made these misrepresentations upon which Eastern allegedly detrimentally relied, Eastern has failed to show affirmative misconduct on the part of the Government. Eastern contends the Government engaged in affirmative misconduct when it failed both to apprise Eastern of the regulations promulgated under RCRA and to assist Eastern in complying with the regulations. Def. Brief at 22. The Government, however, does not have a duty to apprise the public of regulations which are readily available to the public. The Supreme Court has noted "the failure to give effective notice of information that ... was

concededly published in the Federal Register ... does not 'give rise to an estoppel against the Government.'" *Lyng v. Payne,* 476 U.S. 926, 935, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (quoting *INS v. Hibi,* 414 U.S. 5, 8–9, 94 S.Ct. 19, 22, 38 L.Ed.2d 7 (1973) (*per curiam* )), *reh'g denied,* 478 U.S. 1031, 107 S.Ct. 11, 92 L.Ed.2d 766 (1986).

In *Public Interest Research Group,* the court was also faced with an argument that the Government had failed to apprise a defendant of the relevant regulatory provisions and how the defendant could comply with those regulations. In *Public Interest Research Group,* the defendant held a permit from a state regulatory authority which allowed the defendant to discharge certain amounts of pollutants into a body of water adjacent to the defendant's manufacturing plant. 757 F.Supp. at 442. The permit required the defendant to test the discharged pollutants for silver content. *Id.* at 448. The defendant argued the Government should be estopped from arguing the defendant violated the testing requirement because Government officials had on one occasion misrepresented that testing was not necessary and on several other occasions failed to state whether testing was necessary. *Id.* at 448–49.

---

until April 1987. Consequently, there was no conduct by the Government which would constitute a representation prior to April 1987.

**23.** It has been held that a person may not rely upon representations of the Government when that person had a duty to familiarize him or herself with the relevant legal requirements and when the representations were orally and informally given. *United States v. Board of Education,* 697 F.Supp. 167, 178 (D.N.J.1988); *see Community Health Serv.,* 467 U.S. at 64, 104 S.Ct. at 2225 ("[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."). In this case, it is apparent Eastern had an obligation to familiarize itself with the relevant RCRA regulations, notwithstanding its failure to do so. Moreover, the EPA's representations regarding Eastern's compliance with RCRA were clearly informal. Accordingly, any reliance by Eastern on those representations, assuming they were in fact made, may not have been reasonable.

Eastern also contends it reasonably relied upon representations of its suppliers, its envi-

ronmental consultant .and the New Jersey Department of Environmental Protection that Eastern was in compliance with the regulations under RCRA. Def. Brief at 20–21, 22–23 n. 21. Such representations, however, were not made by the EPA and, accordingly, would not present a basis for estopping the Government.

Eastern's contention that the RCRA regulations are confusing has no merit. As discussed above, the regulatory framework, albeit complex, is not so confusing that it is incomprehensible. If anything, the regulations display a flexibility which favors the used oil industry. For example, the regulations do not mandate the testing of used oil to determine if it complies with the regulations. *See* 50 Fed.Reg. at 49,190. Rather, the industry is permitted to attempt to prove it is in compliance in a manner the industry deems appropriate, which may or may not include testing. *Id.* Eastern's argument can be viewed as an attempt to take advantage of the flexibility offered by the regulations to avoid the regulations altogether.

The court rejected defendant's argument. The court first reasoned that the Government's silence was ambiguous and that "[i]t would be unreasonable to rely on silence in order to ignore the clear wording of a permit." *Id.* at 449. The court then explained it was unreasonable to rely on the misrepresentation that testing was not needed. *Id.* The court stated: "[R]eliance on oral assurances for interpretation is generally inappropriate, especially where those statements run counter to express written provisions or a permit." *Id.*

In this case, the regulations set forth in Subpart D were disseminated to the public in 1985. Consequently, there is no basis upon which Eastern could argue the Government should be estopped because it failed to apprise them of Subpart D when the relevant regulations governing Eastern's used oil management activities were published in 1985. *See Lyng,* 476 U.S. at 935, 106 S.Ct. at 2340.

In addition, the Government cannot be said to have a duty to assist Eastern in complying with the RCRA regulations such that failure to assist constitutes affirmative misconduct. Eastern, for example, contends the EPA failed to inform it that it should have tested both its incoming and outgoing used oil for hazardous waste. Def. Brief at 12–13. It has been held, however, that "neither carelessness . . . nor a reluctance to be of assistance . . . are tantamount to affirmative misbehavior." *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985). Therefore, the alleged refusal of the Government to assist Eastern in complying with regulations of which Eastern should have been aware does not justify an assertion of estoppel against the Government.

Eastern also contends the EPA engaged in affirmative misconduct by praising Eastern's operations when the Government should have informed Eastern that it was in violation of the regulations.[24] Def. Brief at 22. Eastern contends the EPA failed to notify Eastern that it had violated Subpart D prior to bringing suit. *Id.* at 12. In essence, Eastern contends the EPA should have openly communicated with Eastern regarding how it could comply with EPA regulations rather than collect evidence to use against Eastern in a lawsuit. *Id.* at 13–15.

The failure of the Government to apprise Eastern of the possibility it was violating the regulations, however, does not meet the strict standard for finding the Government is estopped from enforcing regulations. *See New Jersey v. Department of Health and Human Serv.,* 670 F.2d 1284, 1297–98 (3d Cir.) (failure to apprise insufficient to establish estoppel), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982). Even if the EPA had erroneously informed Eastern that it was in compliance with RCRA, that erroneous information does not justify estopping the Government from enforcing RCRA. It has been held that the erroneous dissemination of information by a Government agent does not establish estoppel when the party asserting the estoppel defense had a legal duty to comply with a regulatory framework. *United States v. Louisiana–Pacific Corp.,* 682 F.Supp. 1122, 1140 (D.Colo.1987) (citing *Emery Mining Corp. v. Secretary of Labor,* 744 F.2d 1411 (10th Cir.1984)). In this case, Eastern had an obligation, regardless of what the EPA told it, to comply with the RCRA regulations. Therefore, Eastern cannot be heard to complain that the Government misinformed or failed to inform Eastern of its potential liability.

■■■ Eastern contends the conduct of the EPA officials who inspected the Facility violated the EPA's inspection manual. Def. Brief at 21; Def. Opp. at 10. One EPA manual provides, for example, that EPA officials should conduct courteous dis-

---

**24.** In contrast, the Government contends EPA officials informed Eastern its used oil was off-specification. Wilk Deposition at 32. Moreover, the Government contends EPA officials complemented Eastern on its potential to "do a good job" in complying with the RCRA regulations. *Id.* at 122–23. Even assuming EPA offi-

cials praised Eastern's operations, the quality of Eastern's operations is merely relative to the quality of other operations in the used oil industry. Praise of Eastern's operations would not preclude a finding that Eastern was in violation of RCRA.

cussions with used oil marketers and tactfully offer suggestions. *See* Def. Brief, Exhibit G at 4–31–4–33. Significantly, this EPA manual specifically states an EPA "inspector should not ... suggest to the owner/operator or facility representative that they are in criminal violation of RCRA or that they will be receiving a court action of any kind." *Id.* at 4–25. Moreover, an EPA inspector "should avoid providing any advice or assistance that would prejudice the government's case in a subsequent enforcement action...." *Id.* at 4–33.

The refusal of EPA officials to inform Eastern of the potential violation of RCRA does not appear to be inconsistent with this manual. For example, in keeping with the mandate to offer suggestions, EPA officials informed Eastern its used oil was off-specification. Wilk Deposition at 32. Even if the silence of EPA officials is construed as somehow discourteous or unhelpful, that would appear to be only a minor breach of the manual motivated perhaps by a desire to avoid compromising an EPA enforcement action. Significantly, the Supreme Court has noted a minor breach of an administrative agency's internal manual is insufficient to estop the Government. *Schweiker v. Hansen,* 450 U.S. 785, 789–90, 101 S.Ct. 1468, 1471–72, 67 L.Ed.2d 685 (*per curiam*), *reh'g denied,* 451 U.S. 1032, 101 S.Ct. 3023, 69 L.Ed.2d 401 (1981).

Eastern argues the Government should have commenced an administrative proceeding to compel Eastern to comply with RCRA, rather than brought a civil action to compel compliance. Def. Opp. at 11. Eastern notes that the EPA has sometimes attempted to resolve disputes regarding compliance informally, rather than by bringing suit. RCRA, however, specifically gives the EPA the option either to commence a civil proceeding or to commence an administrative proceeding to compel compliance with the strictures of RCRA. 42 U.S.C. § 6928(a)(1); *see* Def. Brief, Exhibit G at 4–25 (EPA manual indicating EPA may initiate any one of several types of enforcement actions, including civil suits). Moreover, the fact that the EPA may have assisted other marketers of used oil fuel to comply with RCRA does not vitiate the EPA's power to commence suit to enforce regulations designed to prevent the mishandling of hazardous waste. Therefore, it was appropriate for the Government to commence a civil suit against Eastern rather than to commence an administrative proceeding.

Eastern has failed to raise a genuine issue of material fact regarding its estoppel defense. Even assuming the Government misrepresented the state of Eastern's compliance with RCRA, there was no affirmative misconduct on the part of the Government.[25] It was appropriate for the

---

**25.** The cases cited by Eastern in support of its estoppel argument are distinguishable. In *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), the Court was faced with the question whether the petitioner had waived his right to obtain United States citizenship by executing a particular document. *Id.* at 46, 71 S.Ct. at 555. A Government agent erroneously informed the petitioner that execution of the document would not waive the right to obtain citizenship. The Court expressly declined to reach the estoppel issue. *Id.* at 47, 71 S.Ct. at 556. Rather, the Court held the waiver was made without full information and was therefore invalid. *Id.*

In *Corniel-Rodriguez v. INS,* 532 F.2d 301 (2d Cir.1976), the court held the Government committed an act of affirmative misconduct when a Government agent failed to comply with his statutory duty to inform the petitioner of certain restrictions on her visa. *Id.* at 306–07. As discussed, there was no affirmative duty on the part of the EPA to inform Eastern of the RCRA regulations or to inform Eastern it was not in

compliance with the regulations. Accordingly, *Corniel-Rodriguez* is distinguishable.

In *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970), the court held estoppel may be appropriate when the Government gives "erroneous advice ... in the form of a crucial misstatement in an official decision." *Id.* at 57. In this case, Eastern has not alleged the EPA made an official decision containing a "crucial misstatement." Accordingly, *Brandt* is distinguishable.

In *Tosco Corp. v. Hodel,* 611 F.Supp. 1130 (D.Colo.1985), *vacated,* 826 F.2d 948 (10th Cir. 1987), the court reiterated the general rule that persons dealing with the Government have a duty to familiarize themselves with relevant laws and may not rely on incorrect information regarding those laws given by Government agents. *Id.* at 1204. The court noted, however, that this rule "has less impact ... when those persons are dependent upon a governmental agency to interpret its own complex body of rules and regulations." *Id.*

In this case, it is doubtful the RCRA regulations are so complex and confusing that Eastern

Government to conduct an inspection of the Facility with the purpose of gathering information on compliance with RCRA. Moreover, the Government has the statutory discretion to decide how it wants to enforce RCRA. Accordingly, Eastern's motion for summary judgment on the grounds of estoppel is denied. Summary judgment is granted in favor of the Government dismissing Eastern's estoppel defense.

### D. The Tenth through Fourteenth Claims

Eastern moves for summary judgment on the Tenth, Eleventh and Thirteenth Claims on the ground that while it may have possessed off-specification used oil, it did not ship any off-specification used oil from its Facility. Def. Motion Brief at 4. Therefore, Eastern contends, it is not subject to regulation under Subpart E. *Id.* Eastern further contends it has the "other information" required under 50 Fed.Reg. at 49,190 to substantiate its claim that the used oil it shipped was within specification. Def. Motion Brief at 6–7. Eastern moves for summary judgment on the Fourteenth Claim on the ground it has retained the analyses required under 40 C.F.R. § 266.-43(b)(6)(i) from April 1987 to the present, a period exceeding the three-year period required for retention of analyses. Def. Motion Brief at 11.

The Government opposes Eastern's motion by arguing Subpart E regulates entities which receive off-specification used oil, regardless of whether the off-specification used oil is later shipped off-premises. Gov't Response at 8–9. In addition, the Government argues Eastern has not sustained its burden, with analyses or other information, of proving the used oil it marketed was within specification. *Id.* at 10. The Government moves for summary judgment on the Tenth through Fourteenth Claims on the grounds Eastern has not complied with the requirements of Subpart E.

### 1. *Applicability of Subpart E*

As mentioned, Subpart E regulates the marketing of used oil fuel which meets or exceeds specification. Subpart E provides, in pertinent part:

(a) Persons who market used oil fuel are termed "marketers". Except as provided below, marketers include generators who market used oil fuel directly to a burner, *persons who receive used oil from generators and produce, process, or blend used oil fuel from these used oils* (including persons sending blended or processed used oil to brokers or other intermediaries), and persons who distribute but do not process or blend used oil fuel....

40 C.F.R. § 266.43(a) (emphasis added).[26] Eastern has admitted it owns and operates a used oil blending and marketing facility which accepts off-specification used oil. Answer, ¶ 43; *see* Amended Complaint, ¶ 43. In addition, Eastern has admitted it sells a blend stock used oil fuel. Answer, ¶¶ 7–8, 11; *see* Amended Complaint, ¶¶ 7–8,

---

justifiably relied upon the alleged representations of the EPA. Significantly, however, it is disingenuous for Eastern to contend it had to rely upon the EPA's interpretations of the RCRA regulations. Eastern concedes it was not even aware of the regulations until 1987, two years after they were promulgated. The case for reliance in *Tosco* was more compelling because the party asserting estoppel had actually relied upon the agency's interpretations of the relevant regulations. Moreover, the agency in *Tosco* had consistently interpreted the relevant laws for over twenty-eight years. *Id.* at 1206–07. In this case, Eastern has not argued that it has relied upon a consistent body of EPA interpretation of the RCRA regulations. Accordingly, *Tosco* is distinguishable.

**26.** Subpart E excludes from its coverage the following persons:

(1) Used oil generators, and collectors who transport used oil received only from generators, unless the generator or collector markets the used oil directly to a person who burns it for energy recovery....

(2) Persons who market only used fuel that meets the specification under § 266.40(e) and who are not the first person to claim the oil meets the specification (i.e., marketers who do not receive used oil from generators or initial transporters and marketers who neither receive nor market off-specification used oil fuel).

40 C.F.R. § 266.43(a).

11. Eastern has not argued it is excepted from the definition of marketers under 40 C.F.R. § 266.43(a)(1)–(2).[27]

The Government concedes it currently has no evidence which shows Eastern shipped off-specification used oil from the Facility. Gov't Response at 20 n. 14. The fact that it is unknown whether Eastern shipped any off-specification used oil does not, however, appear to be significant to the question whether Eastern is subject to regulation under Subpart E. Marketers of used oil are regulated when they receive used oil fuel which is off-specification. *See* 40 C.F.R. § 266.43(a). One aspect of the regulation is that such marketers may not market off-specification used oil except to certain classes of consumers. *See* 40 C.F.R. § 266.43(b)(2); *see also* 40 C.F.R. § 266.41(a). Consequently, the fact that Eastern may not have in fact shipped off-specification used oil is of no moment to the issue of whether Eastern generally is subject to regulation under Subpart E.

Because Eastern receives off-specification used oil from their suppliers, Eastern is a marketer of used oil subject to regulation under Subpart E. The next relevant issue is whether Eastern has complied with the specific provisions in Subpart E which deal with marketers of off-specification used oil fuel.

2. *Off-specification Used Oil Fuel*

■■■■ Subpart E provides, in pertinent part: "Used oil fuel is subject to regulation under this subpart unless the marketer obtains analyses or other information documenting that the used oil fuel meets the specification provided under § 266.-40(e)." 40 C.F.R. § 266.43(b)(1). The burden of proving used oil is within specification is clearly and squarely placed upon the marketer. According to the preamble to this provision:

When a person first claims used oil fuel meets the specification, today's rule requires that he obtain an analysis or other information to support the claim. Thus, testing is not specifically required to demonstrate compliance with the specification. (Ordinarily, however, we expect that testing will be used to demonstrate compliance.) The "other information" could include personal, special knowledge of the source and composition of the used oil or a certification from a generator to the processor claiming the oil meets the specification. As explained above, however, if a person who claims used oil fuel meets the specification based on "other information" and the determination is found to be erroneous (i.e., if testing reveals that the oil fails the specification), he is in violation of the regulations.

It should be noted further that if a marketer claims used oil fuel meets the specification when in fact it does not when analyzed by EPA or State enforcement officials at any point until ultimately burned, it is not a defense that the recipient ... reasonably believed the oil met the specification....

50 Fed.Reg. at 49,190. Therefore, there appear to be two ways by which a marketer may sustain its burden of proving used oil is within specification. A marketer may perform analyses or the marketer may possess other particularized information which indicates the used oil is within specification.[28]

■■■■ Accordingly, Eastern has produced thirty-seven reports of analyses performed

27. Section 266.43(a) provides, in pertinent part:
 ... The following persons are not marketers subject to this subpart:
 (1) Used oil generators, and collectors who transport used oil received only from generators, unless the generator or collector markets the used oil directly to a person who burns it for energy recovery. However, persons who burn some used oil fuel for purposes of processing or other treatment to produce used oil fuel for marketing are considered to be burning incidentally to processing. Thus, generators and collectors who market to such inci-

dental burners are not marketers subject to this subpart;
 (2) Persons who market only used oil fuel that meets the specification under § 266.40(e) and who are not the first person to claim the oil meets the specification....
40 C.F.R. § 266.43(a)(1)–(2).

28. The Government contends each and every shipment of used oil must be tested to determine if it is within specification. Gov't Off–Specification Reply at 7–8. The preamble to Subpart E, however, specifically states the EPA

on various tanks at the Facility. *See* Def. Motion Brief, Exhibit B. The first report, dated 23 April 1987, is for samples of used oil taken on 10 April 1987. The last report is dated 13 December 1990. Generally, all of these reports indicate the sampled oil was within specification, except for the following: [29] (1) Report Number 01023, dated 23 April 1987, indicated the sample taken from Tank 30 exceeded the 100 ppm specification for lead and the flash point was below the specification of 100 °F, (2) Report Number 01144, dated 13 July 1987, indicated the sample of Number 4 fuel oil exceeded the 10 ppm specification for chromium and (3) Report, dated 7 September 1990, indicated the sample taken from Tank Number 26 exceeded the specification for lead. In addition, reports dated 21 February 1989 and 29 December 1989 do not set forth any values for the flash points of the samples.

Tank 30 appears to be a tank containing used oil in the form received from Eastern's suppliers. Def. Brief at 5. It does not appear to be a tank containing the final product Eastern ships to its customers. *Id.* Tank 26 also appears to be a tank containing used oil in the form received from Eastern's suppliers. *See* Def. Brief, Exhibit V. It is unclear whether the Number 4 fuel oil referred to in Report Number 01144, dated 13 July 1987, was oil Eastern shipped to its customers. This uncertainty raises a genuine issue of material fact. Because some, albeit few, of the samples taken between April 1987 and December 1990 indicate Eastern's used oil was off-specification, Eastern's contention it did not ship off-specification used oil is called into question.

Eastern apparently did not test its used oil as extensively during the period from the promulgation of Subpart E in 1985 to April 1987 as it did during the period after April 1987.[30] Nonetheless, Eastern asserts it possesses "other information" which suggests the used oil it managed during the period from 1985 to 1987 was within specification.[31] Def. Motion Brief at 9–10; Def. Reply at 5–6. Eastern has submitted nine

---

declined to establish a specific schedule of testing. *See* 50 Fed.Reg. at 49,190. The EPA noted:

Repeated testing may not be warranted in every situation. For example, a generator who burns on-site his used oil that testing shows meets the specification may elect to eliminate or reduce the frequency of testing if, for example, the processes that generate the oil do not change. In this case, the generator is using "other information" in lieu of testing.

*Id.* at 49,190 n. 86. Accordingly, the EPA stated:

The frequency of testing necessary to ensure conformance with today's rules will vary from situation to situation depending on factors including: (1) Type of, and changes in, sources of used oil; (2) historical results of tests; (3) tank filing and drawdown practices; and (4) tank capacities. Although today's rule does not necessarily require that each incoming shipment of used oil be analyzed for conformance with the presumption of mixing, or that each outgoing shipment of specification used oil be analyzed for conformance with the specification (or that testing be conducted at all), the marketer must be satisfied that each such shipment conforms. In short, testing must be conducted as often as necessary, and the burden is necessarily on the marketer to determine how often is often enough.

*Id.* at 49,190. Therefore, under the regulatory scheme, Eastern does not have to test each shipment of used oil to determine if the shipment is within specification. Eastern, however, must be satisfied on the basis of testing or other information that each shipment is in fact within specification. Significantly, if Eastern relies on other information, then that information must be objective and particularized, otherwise a marketer of used oil could claim his or her oil is within specification with little or no reasonable basis. *See, e.g., id.* (noting other information could include "personal, special knowledge of the source and composition of the used oil or a certification from a generator to the processor claiming the oil meets specification").

**29.** Notwithstanding the fact certain reports indicate some samples of oil were off-specification, Eastern contends every single sample analyzed was within specification. Def. Motion Brief at 5.

**30.** The Government suggests Eastern did not commence testing in accordance with Subpart E and the specification until April 1987, after the EPA conducted an inspection of the Facility. Gov't Response at 21. Although the EPA's regulations governing Eastern's used oil activities were published in final form in 1985, Eastern acknowledges it was not aware of the regulations until April 1987. Def. Reply at 6.

**31.** The Government contends Eastern may not rely on "other information" to support its assertion that its used oil was within specification

reports of analyses performed on used oil Eastern received from its suppliers in 1986. *See* Def. Motion Brief, Exhibit F. The first report is dated 16 June 1986 and the last report is dated December 1986. Of the substances listed in the specification, the 1986 analyses tested only for the presence of lead. Analyses were performed to determine the flash point of only two of the samples.

Significantly, the 1986 reports indicate that of the twenty-three samples analyzed in 1986, all but one sample substantially exceeded the 100 ppm specification for lead. Eastern suggests that after blending the off-specification used oil with virgin oil, the concentrations of lead in the blended used oil would be well within the specification.[32] Def. Motion Brief at 9 n. 11. Because Eastern has historically blended used oil with virgin oil in the same proportions both before and after April 1987,[33] and presumably because Eastern's used oil fuel after April 1987 was allegedly within specification, Eastern infers that used oil fuel shipped prior to April 1987 was within specification. Def.Motion Brief 9–10.

In essence, Eastern assumes the oil blended before April 1987 was within speci-

fication because the oil blended after April 1987 was within specification. As discussed above, however, the analyses of Eastern's used oil fuel performed after April 1987 indicated some of Eastern's used oil fuel may not have been within specification. Therefore, the inference Eastern makes regarding its used oil fuel blended in 1986 is suspect.

The Government concedes it does not possess specific evidence that Eastern in fact marketed off-specification used oil.[34] Gov't Response at 20 n. 14. There is, however, a genuine issue of material fact as to whether Eastern marketed off-specification used oil fuel because one of the analyses submitted by Eastern indicates the sampled oil was off-specification.[35] Nevertheless, summary judgment may still be appropriate for certain claims because not all of the relevant regulations require that Eastern actually have shipped the off-specification used oil fuel to its customers. Accordingly, the Tenth through Fourteenth Claims will each be considered in turn.

### 3. *Tenth Claim*

 The Tenth Claim is brought for an alleged violation of 40 C.F.R. § 266.-

---

unless tests have already shown the used oil was within specification and the source of the used oil has not changed. Gov't Response at 24. The preamble to the regulations, however, provides: "[T]esting is not specifically required to demonstrate compliance with the specification. (Ordinarily, however, we expect that testing will be used to demonstrate compliance.) [.]" 50 Fed. Reg. at 49,190. Accordingly, it appears the EPA does not require that testing always be performed before a marketer of used oil may rely on "other information" to prove that it oil was within specification.

32. Steven E. Way, an EPA official, stated during his deposition that used oil containing amounts of lead such as the amounts indicated in the 1986 reports, when blended with virgin oil in the proportions historically utilized by Eastern, would result in a used oil fuel within specification. Def. Motion Brief, Exhibit D at 120–21.

33. Eastern historically has blended one part used oil with five to twenty parts virgin oil. Def. Motion Brief at 9.

34. Eastern contends analyses performed by the EPA indicates used oil shipped by Eastern was not off-specification. Def. Motion Brief at 6.

Eastern relies upon an EPA Office of Enforcement and Compliance Monitoring report, dated July 1988, which sets forth the results of analyses performed on some of Eastern's used oil. Def. Motion Brief, Exhibit C. The report indicates, however, that the analyses did not test for all of the hazardous materials set forth in the specification at 40 C.F.R. 266.40(c). Accordingly, the report cannot be considered as conclusive evidence that Eastern's used oil fuel was within specification.

Eastern also relies on the deposition testimony of the EPA official who prepared the July 1988 report to support Eastern's argument that the used oil it shipped was within specification. Def. Motion Brief at 6. In his deposition, the EPA official stated EPA analyses indicated Eastern had not shipped off-specification used oil. Def. Motion Brief, Exhibit D at 72–74 & 79. The testimony of the EPA official, however, was based on the July 1988 report. Accordingly, the representation of the EPA official that Eastern did not ship off-specification used oil fuel cannot be deemed conclusive.

35. The Government represents that it is not seeking a finding that Eastern shipped off-specification used oil after April 1989. Gov't Response at 23 n. 19.

43(b)(3). Amended Complaint, ¶ 91. Section 266.43(b)(3) provides a marketer of used oil must provide "[n]otification to EPA stating the location and general description of used oil management activities...." [36] 40 C.F.R. § 266.43(b)(3). Such notification was to have been filed with the EPA no later than 29 January 1986. 40 C.F.R. 49,164 (1985); *see* 42 U.S.C. § 6930 (notification must be filed no later than ninety days after promulgation of RCRA regulations). Section 266.43(b)(3) refers only to management activities and does not require that off-specification used oil fuel actually be shipped to customers. Accordingly, summary judgment may be appropriate.[37]

 Eastern concedes notification of its off-specification used oil management activities was not provided to the EPA until 7 July 1987. Answer, ¶ 92. Eastern filed its notification 524 days after it was due on 29 January 1986. There is therefore no genuine issue of material fact that this notification was untimely. Accordingly, summary judgment is granted in favor of the Government on the Tenth Claim in the Amended Complaint.

**36.** Eastern contends the notification is required only if the marketer in fact markets off-specification used oil. Def. Motion Brief at 3. Under the express terms of section 266.43(b)(3), however, all marketers of used oil, regardless of whether the used oil is off-specification, must provide notification to the EPA. The regulation states the notification must describe "used oil management activities," not "off-specification used oil management activities." 40 C.F.R. § 266.43(b)(3). Therefore, it appears Eastern was required to file its notification with the EPA even if it did not in fact market off-specification used oil.

**37.** Eastern contends the Government's argument in support of its motion for summary judgment as to the Tenth Claim is an improper attempt to amend the Tenth Claim. Def. Reply at 8. The Tenth Claim alleges Eastern "failed to timely notify EPA of its activities as a marketer of off-specification used oil, in violation of 40 C.F.R. § 266.43(b)(3)." Amended Complaint, ¶ 94. Eastern contends this allegation limits the Tenth Claim to a claim for failure to notify of the marketing of off-specification used oil and excludes a claim for failure to notify of the marketing of specification used oil as the Government argues in support of its motion for summary judgment. Def. Reply at 9.

Under Rule 8 of the Federal Rules of Civil Procedure, "[e]ach averment of a pleading shall

### 4. *The Eleventh Claim*

The Eleventh Claim is brought for an alleged violation of 40 C.F.R. § 266.43(b)(5)(i). Amended Complaint, ¶ 98. Section 266.43(b)(5)(i) provides:

(5) *Required Notices.* (i) Before a marketer initiates the first shipment of off-specification used oil to a burner or other marketer, he must obtain a one-time written and signed notice from the burner or marketer certifying that:

(A) The burner or marketer has notified EPA stating the location and general description of his used oil management activities; and

(B) If the recipient is a burner, the burner will burn the off-specification used oil only in an industrial furnace or boiler identified in § 266.41(b)....

40 C.F.R. § 266.43(b)(5)(i). Section 266.43(b)(5)(i), on its face, requires the shipment of off-specification used oil fuel. Because there is a genuine issue of material fact as to whether Eastern actually shipped off-specification used oil fuel, summary

be simple, concise, and direct. No technical forms of pleading ... are required." Fed.R.Civ.P. 8(e)(1). Moreover, "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f). The Third Circuit has stated that under the liberal pleading rules of the Federal Rules of Civil Procedure, "it is enough that a complaint put the defendant on notice of the claims against him." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 790 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *see Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957).

In this case, it is apparent the Amended Complaint places Eastern on notice that suit is brought against them for a violation of 40 C.F.R. § 266.43(b)(3). The Amended Complaint clearly states section 266.43(b)(3) is the statutory predicate for the Tenth Claim. *See* Amended Complaint, ¶ 91 ("Pursuant to 40 C.F.R. § 266.43(b)(3) marketers were required to notify EPA of their used oil activities."). Accordingly, the Amended Complaint meets the pleading requirements of Rule 8. The language referring to off-specification used oil is merely gratuitous and does not vitiate the adequacy of the pleading. Eastern's objection to the Tenth Claim has no merit.

judgment as to the Eleventh Claim may not be granted in favor of either Eastern or the Government.

### 5. The Twelfth Claim

■ The Twelfth Claim is brought for an alleged violation of 40 C.F.R. § 266.-43(b)(5)(ii). Amended Complaint, ¶ 102. Section 266.43(b)(5)(ii) provides:

> Before a marketer accepts the first shipment of off-specification used oil fuel from another marketer subject to the requirements of this section, he must provide the marketer with a one-time written and signed notice certifying that he has notified EPA of his used oil management activities....

40 C.F.R. § 266.43(b)(5)(ii). This section refers to the acceptance of off-specification used oil and not the shipment of off-specification used oil.

Eastern has not submitted any opposition to the Government's motion for summary judgment as to the Twelfth Claim. Eastern has, however, admitted it provided the required certification notices on 21 February 1989 and 1 March 1989. Answer, ¶ 102. Eastern has also admitted it received off-specification used oil fuel from its suppliers long before 1989. *See* Flynn Decl., Exhibit K (Deposition of Peter Leiwant) at 107; Def.Brief, Exhibit R (Eastern "has received a written notice from [Lionetti] that it is supplying us with off-specification oil."). Significantly, section 266.-43(b)(5)(ii) provides the certification notices must be provided "[b]efore a marketer accepts the first shipment of off-specification used oil...." 40 C.F.R. § 266.43(b)(5)(ii). Therefore, Eastern has failed to comply with section 266.43(b)(5)(ii).

Summary judgment, however, is inappropriate because it is unclear when Eastern received the first shipment of off-specification used oil fuel which would be subject to regulation under Subpart E. There is, in other words, a genuine issue of material fact as to when Eastern received its first shipment of off-specification used oil fuel from other marketers. Accordingly, East-

ern's and the Government's motions for summary judgment as to the Twelfth Claim are denied.

### 6. The Thirteenth Claim

The Thirteenth Claim is brought for an alleged violation of 40 C.F.R. § 266.43(b)(4). Section 266.43(b)(4) provides:

> (4) *Invoice System.* When a marketer initiates a shipment of off-specification used oil, he must prepare and send the receiving facility an invoice containing the following information:
>
> (i) An invoice number;
>
> (ii) His own EPA identification number and the EPA identification number of the receiving facility;
>
> (iii) The names and addresses of the shipping and receiving facilities;
>
> (iv) The quantity of off-specification used oil to be delivered;
>
> (v) The date(s) of shipment or delivery; and
>
> (vi) The following statement: "This used oil is subject to EPA regulation under 40 C.F.R. Part 266"....

40 C.F.R. § 266.43(b)(4). Section 266.-43(b)(4), on its face, requires the shipment of off-specification used oil fuel. Because there is a genuine issue of material fact as to whether Eastern actually shipped off-specification used oil fuel, as previously discussed, summary judgment as to the Thirteenth Claim may not be granted in favor of either Eastern or the Government.

### 7. The Fourteenth Claim

The Fourteenth Claim is brought for an alleged violation of 40 C.F.R. § 266.-43(b)(6)(i).[38] Amended Complaint, ¶ 110.

■ Section 266.43(b)(6)(i) provides:

> (6) *Recordkeeping*—(i) *Used oil fuel that meets the specification.* A marketer who first claims under paragraph (b)(1) of this section that used oil fuel meets the specification must keep copies of analysis [sic] (or other information used to make the determination) of used oil for three years. Such marketers

---

**38.** The Government represents it brings this Claim only for the period from 9 December

1985 through July 1990, a total of 1663 days. Gov't Response at 18 n. 13.

must also record in an operating log and keep for three years the following information on each shipment of used oil fuel that meets the specification. Such used oil fuel is not subject to further regulation, unless it is subsequently mixed with used oils so that it no longer meets the specification.

(A) The name and address of the facility receiving the shipment;

(B) The quantity of used oil fuel delivered;

(C) The date of shipment or delivery; and

(D) A cross-reference to the record of used oil analysis (or other information used to make the determination that the oil meets the specification) required under paragraph (b)(6)(i) of this section.

40 C.F.R. § 266.43(b)(6)(i). The requirements of section 266.43(b)(6)(i) became effective on 9 December 1985. 50 Fed.Reg. at 49,164. Because this section does not refer to off-specification used oil fuel, summary judgment may be appropriate.[39]

It is uncontroverted Eastern has retained the analyses it has performed since April 1987. It therefore appears Eastern has retained the analyses it has performed on its used oil for a period longer than three years. Accordingly, summary judgment is granted in favor of Eastern with respect to the portion of the Fourteenth Claim which alleges Eastern failed to retain analyses under 40 C.F.R. § 266(b)(6)(i).

The Government contends Eastern did not maintain the log required pursuant to section 266.43(b)(6)(i) until September 1990. Gov't Response at 18. Although this fact is uncontroverted, the Government brings this Claim only for the period from the effective date of the regulation to July 1990. *Id.* at 18 n. 13. Accordingly, there is no genuine issue of material fact as to the this aspect of the Fourteenth Claim. Summary judgment is granted in favor of the Government with respect to the portion of the Fourteenth Claim which alleges Eastern failed to maintain a log under 40 C.F.R. § 266.43(b)(6)(i). Summary judgment is granted for the period from 9 December 1985 through July 1990, or 1663 days.

### Conclusion

For the reasons set forth above, both the Government's and Eastern's motions for summary judgment with respect to the First through Ninth Claims are denied. Summary judgment is granted in favor of the Government dismissing Eastern's defense of estoppel. Summary judgment is further granted in favor of the Government with respect to the Tenth Claim. Both the Government's and Eastern's motions for summary judgment with respect to the Eleventh, Twelfth and Thirteenth Claims are denied. Summary judgment is granted in favor of the Government with respect to the Fourteenth Claim to the extent it alleges Eastern failed to maintain a log pursuant to 40 C.F.R. § 266.43(b)(6)(i); summary judgment is granted in favor of Eastern with respect to the Fourteenth

---

**39.** Eastern contends the Government's argument in support of its motion for summary judgment as to the Fourteenth Claim is an improper attempt to amend the Fourteenth Claim. Def. Reply at 8. The Fourteenth Claim alleges Eastern "did not retain copies of analyses, in violation of 40 C.F.R. § 266.43(b)(6)(i)." Amended Complaint, ¶ 110. Eastern contend this allegation limits the Fourteenth Claim to a claim for failure to retain analyses and excludes a claim for failure to maintain an operating log as the Government argues in support of its motion for summary judgment. Def. Reply at 9.

As discussed *supra* n. 37, the Federal Rules of Civil Procedure merely requires that a defendant be placed on notice of the claim against asserted him. *Conley*, 355 U.S. at 47–48, 78 S.Ct. at 102–03; *Seville Indus.*, 742 F.2d at 790; *see* Fed.R.Civ.P. 8. In this case, it is apparent the Amended Complaint places Eastern on notice that suit is brought against them for a violation of 40 C.F.R. § 266.43(b)(6)(i). The *Amended Complaint* clearly states section 266.43(b)(6)(i) is the statutory predicate for the Fourteenth Claim. *See* Amended Complaint, ¶ 109 ("40 C.F.R. § 266.43(b)(6)(i) requires a marketer who first claims that the used oil fuel meets the specification ... to keep copies of analyses ... [and] record in an operating log ... specific information...."). Accordingly, the Amended Complaint adequately pleads a violation of section 266.43(b)(6)(i).

Claim to the extent it alleges Eastern failed to retain analyses pursuant to 40 C.F.R. § 266.43(b)(6)(i). In addition, the Fifteenth Claim is dismissed as having been withdrawn.